THE STATE *Ex Rel.* THE ATTORNEY GENERAL *vs.* HON. Z. PLATT, CIRCUIT JUDGE.

THE STATE *Ex Rel.* THE ATTORNEY GENERAL *vs.* N. G. W. WALKER, SHERIFF.

On March 1, 1870, the General Assembly of the State passed an "Act to revise, simplify and abridge the rules, practice, pleadings and forms of Courts in this State." The 19th Section of the enrolled Act, to which the Great Seal of the State was affixed, and which was signed, in the Senate Chamber, by the President of the Senate and the Speaker of the House of Representatives, and received the approval of the Governor, provided that the Courts for th · County of Barnwell should be held at *Barnwell;* but it appeared by the Journals of the two Houses of the General Assembly, that the same Section of the Bill, as it finally passed both Houses, provided that the Courts for that County should be held at *Blackville.* By the law, as it stood at the passage of the Act, the place last named was the County seat of Barnwell County. *Held,* that the 19th Section of the Act was void, and, consequently, that *Blackville* remained the County seat of Barnwell County.

The enrolled Act, duly authenticated as the Constitution prescribes, and approved and signed by the Governor, is not conclusive evidence of the terms of the Bill, as it passed the Houses of the General Assembly, but the Journals of the Houses, or other appropriate evidence, may be received, to show what those terms were; and, whenever it appears that the enrolled Act differs from the Bill as it passed, in a substantial matter, the Judiciary department of the State may declare the whole Act, or the part affected by the change, unconstitutional and void.

Every substantial part of a proposed enactment is a "Bill," within the constitutional sense of the term, and must pass through all the constitutional stages of enactment before it becomes law.

These were petitions to the Supreme Court for writs of *mandamus:* in the case first stated, to command the Hon. Zephaniah Platt, Circuit Judge of the second Circuit, to hold the Courts of General Sessions and Common Pleas for the County of Barnwell, at the town of Blackville, in said County; and, in the second case, to command N. G. W. Walker, Sheriff of said County, to keep his office, as Sheriff, with its books, records and papers, and office furniture, at the same place.

Under the provisions of two Acts of Assembly, one passed 2d March, 1869, (14 Stat., 202,) and the other approved 26th March, 1869, (14 Stat., 250,) the County seat of Barnwell County had been removed from the town of Barnwell, to the town Blackville, in that County, previous to the 1st of March, 1870.

On the day last mentioned an Act entitled "An Act to revise, simplify and abridge the rules, practice, pleadings and forms of Courts in this State," was passed by the General Assembly of the State. It was duly enrolled, had the Great Seal of the State affixed to it, was

signed, in the Senate Chamber, by the President of the Senate, and the Speaker of the House of Representatives, and was approved and signed by the Governor. It was divided into Parts, Titles, Chapters and Sections, and it contained 475 Sections. Part I, embracing the Sections from 9 to 91, both inclusive, related to "Courts of Justice and their jurisdiction." Part II, embracing the other Sections, except the first eight, related to "Civil Actions."

Part I, Title III, relating to "Circuit Courts," contained Section 19 of the Act, and this Section of the enrolled Act directed, *inter alia*, that the Circuit Courts for Barnwell County should be held at Barnwell, and this was the condition of the Act when it was filed in the office of the Secretary of State. In that office the word "Barnwell" was erased and "Blackville" inserted in its place, and with this alteration the Act was printed by the State Printer. "Blackville," therefore, appears in the printed copy of the Act as the place designated by law for holding the Circuit Courts for Barnwell County.

From the Journals of the two Houses of the General Assembly, it appeared that the 19th Section of the Bill, as it passed both Houses, designated "Blackville" as the place for holding the Circuit Courts for Barnwell County.

Upon the foregoing state of facts being brought to the notice of His Honor Judge Platt, Judge of the Second Circuit, to which the County of Barnwell was attached, he held that the question was concluded, by the terms of the enrolled Act; that "Barnwell" was the place fixed by law for holding the Circuit Courts for that County, and he made an order directing the Sheriff and Clerk of the Court to remove their office books, records, papers and office furniture from Blackville to the last named place.

The Sheriff and Clerk obeyed the order, and thereupon these petitions were filed.

Returns were made admitting the facts, and the cases were argued upon the question of law involved in them.

*Chamberlain*, Attorney General, *Carroll & Melton*, for the State.

*Maher*, for respondents.

Nov. 23, 1870. The opinion of the Court was delivered by

WILLARD, A. J. The Attorney General asks that writs of *mandamus* may issue from this Court in the case first above entitled, to the Circuit Judge of the Second Circuit, commanding him to hold

the Courts of Common Pleas and General Sessions for Barnwell County at Blackville, instead of Barnwell, and, in the last named case, commanding the Sheriff of Barnwell County to hold his office at Blackville.

The main question involved is, whether Blackville or Barnwell is the place appointed by law for the holding of the Courts of Common Pleas and General Sessions for that County.

It is alleged that Section 19 of the "Act to revise, simplify and abridge the Rules, Practice, Pleadings and Forms of Courts in this State," passed March 1, 1870, as published by law, does not conform to the enrolled Act deposited in the office of the Secretary of State, as that Act stood at the time the enrollment was made.

It is admitted, and is to be taken as one of the facts of this case, that, at the time of the enrollment of the Act, and of its signature by the President of the Senate and Speaker of the House of Representatives, and of its presentation to, and approval by, the Governor, and also at the time of its deposit in the office of the Secretary of State, the 19th Section of the Act provided that the Courts of Common Pleas and General Sessions should be held at Barnwell, but that, since being so deposited, the text of the enrolled Act has been altered, so that the Act, as it now stands, requires that these Courts should be held at Blackville.

It is also alleged by the relator that it appears by the Journals of the two Houses of the General Assembly that the Act, as passed by the General Assembly, required the Courts to be held at Blackville, and that the enrollment did not, in this respect, conform to the law as passed.

It becomes a question for our consideration, therefore, whether we can look into the Journals to see in what form the law actually passed the General Assembly, or whether we are precluded, by the form of the enrollment, from further inquiry as to the terms of the Act.

Under the Constitution, the question whether an Act of legislation has the force of law, does not depend merely upon the constitutional majorities of the two Houses having so determined, but upon the performance of certain acts, in part legislative and in part executive, and following each other in a certain order. By Section 21, Art. II, it must have been read three times, and on three several days, in each House; it must have the Great Seal of the State affixed to it, and it must be signed in the Senate-House by the President of the Senate and the Speaker of the House of Repre-

sentatives. By Section 22, Article III, it must have been presented to the Governor, and have been approved and signed by him. But the Governor's signature is not indispensable. If after being returned with his objections, it shall have been reconsidered and approved, in each House, by two-thirds of such House, or if, after being presented for his approval, he shall neither approve it nor return it with his objections, within three days—when these prerequisites are complied with, the Act acquires the force of law under the terms of the Constitution. If either one fails, there cannot be a compliance with the conditions upon which, under the express terms of the Constitution, the force of the Act, as law, depends.

It appertains to the office and authority of the judicial department to enforce the limits imposed by the Constitution upon the authority of the Legislature, by refusing to give force to acts without their sanction, and, accordingly, to determine whether the acts have been duly performed upon which the force of the enactment, as law, depends. Having power to inquire into the existence of these jurisdictional facts, it may resort to whatever evidence, in conformity with the principles and rules of law, is esteemed most conclusive of the fact to be determined.

It is argued, however, that if the enrollment is fair on its face, and if the Great Seal is affixed to it, inquiry must there stop, at least so far as it is a question what are the provisions of the law that has been passed.

The Constitution does not assume to determine what shall, or what shall not, constitute evidence, whether primary or secondary, of the facts upon which the authority of an Act depends. To what source, then, shall we refer, in order to ascertain upon what evidence a judicial inquiry of this nature ought to proceed? This question is substantially answered by Judge Cooley in a manner that commends itself for the breadth and soundness of its reason. He says (Cooley's Constitutional Limitations, 130): " If, when the Constitution was adopted, there were known and settled rules and usages forming a part of the law of the country, in reference to which the Constitution has evidently been framed, and these rules and usages required the observance of particular forms, the Constitution must be understood as requiring them, because, in assuming the existence of such laws and usages, and being framed with reference to them, it has, in effect, adopted them as part of itself, as much as if they were expressly incorporated in its provisions."

It would be putting too narrow a construction upon the language

just quoted to assume that its whole force was confined to cases involving mere questions of technical forms. The rules of evidence which should govern judicial deliberation upon questions of right arising directly out of the Constitution are, in an enlarged sense, observances of form; and the principle laid down by Judge Cooley, and carefully limited by him, embraces fairly matters of form in the sense thus employed. The necessities of this case do not require that this principle should be carried as far as it may with safety be carried. Following this rule thus laid down, in the absence of any express constitutional declaration as to the character and effect of the evidence appropriate for determining the existence of the facts upon which the force of an Act as law depends, we must look to the settled rules and usages forming a part of the law of the country at the time of the adoption of the Constitution, and also to the Constitution itself, to see how far those rules and usages enter into its sense, and have become interwoven with its text. Upon the question, whether the Great Seal should stand as conclusive proof of any of the required facts, other than that of its being fixed as required, Sec. 21, Art. II, furnishes negative evidence.

When several independent acts are required to be performed, in order to accomplish a given result, to say that proof of the performance of one of them shall be admitted as conclusive proof of the performance of the others, is to say, in effect, that that one alone is really requisite. If it should be admitted that the Great Seal possessed, by law, at the adoption of the Constitution, the attributes ascribed to it, in respect of affording final and conclusive evidence of the facts certified under it, still there would be wanting evidence, to be sought for in the Constitution alone, that such force was intended to be given to it in its bearing in weakening the safeguards of the Constitution. Assuming the question to be, whether the Act had passed the Houses by the due number of readings — of which fact the Constitution provided appropriate evidence, namely, the Journals of the proceedings of the Houses (Sec. 26, Art. II)—it is not to be presumed that it was intended that the act of affixing the Great Seal, an act performed apart from the legislative body, in an executive office, should furnish higher evidence of the proceedings of the body than its own Journals.

Looking carefully into the essential character of the judicial act cast upon this Court, it is evident that, allowing the Great Seal, or the signatures of the presiding officers of the respective Houses, to stand as unimpeachable evidence of the identity of the Act, as en-

rolled, with that acted upon by the Houses, would be equally incon-
sistent with the object and intent of the Constitution, as in the case
just supposed. In order to determine whether an Act has passed
through all the requisite stages of legislative progress, its identity, in
each of those stages, must be determined. If the formalities of
enrollment do not prevent us from looking into the Journals, in
order to see that the Bill had its proper readings, of what value will
that be to us, if we are estopped by the enrollment from enquiry as
to what Bill the Journals have relation? To give full force and
effect to the Constitution, if an issue of identity is raised, we must
look into the Bill or Act, at each step of its progress, to determine
that that which has received part of the formalities requisite to its
validity as law is the same with that which has received the residue
of such formalities. Hitherto this question has been considered in
the simplest form in which it is likely to arise, that is, upon the
supposition that the Act, regarded as a whole, is not the same, as
appearing by the enrollment, with that which passed through the
preceding stages of enactment. In regard to this assumed case, we
have no doubt but that we may look at the Journals for the pur-
pose of ascertaining the action of the Houses, and into any evidence
that may be appropriate to show the nature of the Bill, the subject
of such action. A more difficult question here presents itself.
When, as in the present case, the Act, as a whole, has unquestiona-
bly passed through all the requisite stages, but some part, either of
a section or clause, or, as in the case in hand, a mere word, is found
to constitute the difference between the Act in its different stages
of progress, it is necessary to look beyond the expressions of the
Constitution, to its substantial meaning and intent. As regards the
general question, it is much simplified by the fact that the alleged
error does not affect the general integrity or efficiency of the Act,
nor enter into any of the limitations and conditions by which
the Legislature sought to bound the sphere and scope of its provis-
ions. It was, indeed, urged upon the argument that, in the course
of legislative complications attending the passage of the Bill, the
choice between Barnwell and Blackville became an element of
importance, as bearing on the composition of the vote that was
relied upon to pass it; but that is a matter with which we have no
concern, as we are not called upon to analyze the majority that
voted for the Bill, or to say what considerations might, or what
might not, have influenced any portion of that majority to a dif-
ferent course of action. From the stand-point of legal construc-

tion, we must regard it as a matter of indifference, so far as the general scope of the Act is concerned, whether the selection fell upon Barnwell or Blackville, or whether the subject was included or excluded from the Bill. It is evident that a Bill, having in contemplation a complete change in the modes and forms of legal procedure, could not be prejudicially affected in its general usefulness, and perverted from the objects it was intended to secure, by uncertainty as to whether the Circuit Courts of Barnwell County were to be held at the one place or at the other.

It follows, as a necessary consequence, from what has been said, that if the clauses of the Constitution in question operate to the extent of withholding force from a subordinate part of an Act, on the ground that the formalities required for the Act, as a whole, cannot be ascribed to such subordinate part, then we not only have power so to declare, but may resort to such evidence as, in conformity with the ordinary rules of procedure, may be appropriate to make such fact appear.

There remains the important question, whether the Constitution, in prescribing the formalities that should attend legislative enactment, can be regarded as looking to the several parts of which an Act is composed, as well as to the Act as a whole. Section 22, Art. II, of the Constitution, declares that " every Bill or Joint Resolution which shall have passed the General Assembly, except on a question of adjournment, shall, before it becomes a law, be presented to the Governor, and if he approve he shall sign it."

There are but two modes of viewing this clause as it regards the present question : either the term " Bill " is to be regarded as exclusively applicable to the entire enactment as a whole, or else each substantial part thereof is to be regarded as a separate Bill, dependent for its force upon its relation to the several stages of legislative and executive action.

It will be proper here to remark that this doctrine does not lead to the rejection of amendments, notwithstanding they have not received all the readings, for one of the main objects in requiring these separate readings is to increase the facility of amendment. This may, therefore, be regarded as an exception to the general doctrine we have stated above, not springing as a limitation out of the principles fundamental to that doctrine, but imposed by the Constitution itself, as read by the light of the usages and laws of the country prevailing at the time of its adoption.

In a technical sense, the term " Bill " is applicable properly to the

enactment as a whole. Although the technical sense of words should prevail, where not inconsistent with the clear intent of the instrument, yet when such intent requires that words should be used in the larger sense, it is competent so to regard them. If we should hold that the Constitution regards the enactment as a whole, in an exclusive sense, we would be led to the inevitable conclusion that to become a law all the substantial parts of the measure must have together passed through all the requisite stages. The consequences of this would be, that alteration in a substantial part during such progress would be fatal to the whole Bill.

By a substantial part, is meant any Section, clause or word, that conveys a distinct expression of the legislative will which cannot be supplied by construction from the other parts of the Act, leaving out of view that part in which the defect lies. Whether it is to be regarded as substantial, does not depend upon its importance or unimportance to the rest of the Act, but upon its being, in itself, an expression of the legislative will, capable of being the subject of a separate Act. It would lead us to the conclusion, in the present case, that, if the law in question, although, in substance, a code of legal procedure, differed, as it passed the Houses, from the enrolled Act, in respect of any matter, though a mere word, that covered a distinct expression of the legislative will, not capable of being made out by construction, applied to the rest of the Act, the whole must be regarded as unconstitutional. That the Constitution intended no such absurdity, is manifest. When a deed or contract cannot be carried into full execution by reason of error, the law invariably eliminates the error, either by construction or reformation, when that can be done without the substantial destruction of that in which it inheres. This principle is constantly applied to statutes where some independent matter, capable of severance from the body of a statute, is inoperative under the Constitution. The rules of construction are based, in part, upon this principle, so vital to them that they would not only lose their scientific character, but fail to express that common sense fundamental to all legal systems if deprived of it.

Forced upon the opposite construction, that every substantial part of a Bill is to be regarded as a Bill in the sense of the Constitution, we find nothing in our way but the technical import of the term "Bill." It is not easy to perceive why, if any detached part of a statute is a law within the meaning of the Constitution of the United States forbidding States passing laws impairing the obligation

of contracts, any part of a Bill is not a Bill under a clause intended to secure deliberation on the passage of legislative enactments. Such a conclusion is inevitable, if regard is had to the fixed principles governing constitutional construction. The objects had in view, by a Constitution of government, are habitually substantial; matters of form are usually left to the legislative body, as subject to change with the progress of ideas and events. The great objects in view, in framing a Constitution, are the division and distribution of the powers of government, the establishment of limits and boundaries beyond which they shall not be exercised, and the creation of an efficient responsibility tending to restrain and furnish the means to correct neglect or abuse of public authority. Clauses having for their object the creation of responsibility in the exercise of political functions are, to a large extent, intended to act upon the motive, either by way of creating inducements for right action, or removing the temptation or opportunity to such abusive exercise. This is, in part, accomplished by fixing the responsibility for all political action in some defined person, or body of persons, by securing deliberation in the performance of public acts, and by ascertaining modes of authentication and action in important cases vitally affecting the welfare of the State. It is obvious that, in construing clauses of this class, substance, rather than form, is to be considered. The object to be secured is to be sought for, not alone in the formal expressions of the Constitution, nor yet in the technical character of the means employed to secure its ends, but, in the nature of the subject, intended to be acted upon through such means. In a word, the language of the Constitution, in such cases, is to be construed in the largest sense fairly attributable to it, and that will best subserve the objects it has in view.

The clauses of our Constitution under examination belong to the class just specified, their objects being to prevent abuses in the exercise of the most important function of the government, namely, that of making laws, by securing deliberation and solemnity of authentication in such form as to fix a personal responsibility at every stage in the progress of an Act of legislation. It is altogether a mistaken view to suppose that the object of these clauses was either to confer upon the signatures of the attesting officers power to cover up fatal defects in the passage of Acts, or to conserve the outward, visible and tangible form of a law, without consideration for the vital matters that are contained within it. We would altogether fail to appreciate the spirit that animates the system of constitu-

tional law, the flower of jurisprudence, native to our own country, should we apply the narrow rules of technical construction contended for to the clauses in question. The principles characteristic of that system have been evolved from the highest reason under the experiences of a political system securing the largest field of human action and motive for the enterprise of thought. They are like the atmosphere we breathe, animating and all-pervading, and if not definable with that sharpness of outline that affords the highest qualification to the scientific mind, yet they are capable of reducing to precision and definiteness of outline the institutions and laws which derive their substance and vigor from them.

We are forced to conclude that the safeguards set forth in Section 23, Art. III, of the Constitution, are applicable not only to the title and body of an Act of legislation, but to every substantial matter contained therein, with the same effect as if such substantial matter was an independent Act of legislation in itself.

As we have already concluded that we may look into the Journals, or beyond them, in a proper case, in order to see that there has been a compliance with the terms of the Constitution, it remains for us to ascertain whether the designation of a place for holding the Courts of Common Pleas and General Sessions for the County of Barnwell has been accomplished by Section 19 of the Act in question, in accordance with the requirements of the Constitution.

The Journals of the General Assembly make it to appear that, as the Bill stood on its final passage, Section 19 read Blackville, while it read Barnwell as presented to the Governor for his approval. The consequence is, that so much of Section 19 as attempts to designate a place of holding said Court is without the force of law. In other words, the legal effect is the same as if an independent Act, making Blackville the place of holding the Courts, had passed the General Assembly, and a totally different Act, making Barnwell the place, had been submitted to the Governor, in lieu of that passed by the General Assembly.

Previous to the passage of the Act in question, the place of holding the Courts was fixed by law at Blackville, and, unless that law has been repealed by this Act, that place still remains the place of holding such Courts. Section 471 of the Act of March 1st, 1870, contains the repealing clauses, which only extend to statutory provisions inconsistent with that Act. As the Act does not designate

as law any place of holding such Courts, there is nothing inconsistent that can lead to the repeal of the former Act.

Before leaving this portion of the case, it is proper to remark, in view of the important bearing of the Act in question on the jurisdiction and forms of proceeding of the Courts, that, in our judgment, the residue of the Act, beyond that portion held by us not to be of force as law, is unaffected thereby, inasmuch as that is a distinct and independent matter, no way affecting the scope and efficiency of the Act, according to the intention of the law-maker.

In the case of the application against the Circuit Judge of the Second Circuit, it is sought to obtain a *mandamus* requiring him to hold his Courts of Common Pleas and General Sessions at Blackville instead of at Barnwell. It is admitted that the last term was held at Barnwell. The next term for Barnwell is to commence on the second Monday of December next. The initiatory step towards the holding of that term is the issuing of the *venire facias.* By Section 8 of the "Act to regulate the manner of drawing jurors," passed September 26, 1868, this writ is to be issued by the Clerk at least fifteen days before the commencement of the term. Unless that act is compelled, or voluntarily performed, the term must, for all substantial purposes, fail. The Circuit Judge has no other power than this Court possesses to compel the performance of this act, namely a writ of *mandamus.* By *mandamus* he may compel the Clerk to make his writ returnable at the proper place of holding the Court. Should a writ of *mandamus* be issued to the Circuit Judge, he could be called upon to yield no further obedience to it than by his personal attendance at the time and place of holding the Court. His presence does not insure the presence of the other necessary component parts of the Court. It is not the office of the writ, when issued by this Court, to forestall such judicial determination as he may make on a writ of *mandamus* issued by himself, nor to compel him to issue such writ.

The issuing of the writ by us, under such circumstances, is novel, ineffectual and unnecessary. It is to be presumed, in view of the present determination of this Court, that the Circuit Judge will hold his Court at the proper time and place, if the requisite preparations have been made by the other officers whose corporate action is necessary to the assembling of a Court. Should they fail to perform their duty, there is abundant means of compelling such performance; but that cannot be done by means of a mandate addressed to the Circuit Judge.

The Sheriff is bound to hold his office at the place of holding the

Courts, and that, as we have held, is Blackville. The public have an interest in the performance of this duty, and they have a right to the means of compelling it through their official representative, the Attorney General.

The prayer for a writ against the Circuit Judge of the Second Circuit is denied. A peremptory writ will issue in the case against the Sheriff in accordance with the relator's prayer.

*Wright,* A. J., concurred.

MOSES, C. J., (dissenting.) The Constitution of the State denies to any Bill passed by the General Assembly "the force of law," unless it shall have been read three times, and on three several days, in each House, has had the Great Seal of the State affixed to it, and has been signed in the Senate-House by the President of the Senate and the Speaker of the House of Representatives, (Art. II, Sec. 21.) A restriction thus far is imposed on the action of the Legislature.

The Constitution requires, too, not in fact the aid or co-operation of the Executive in the enactment of laws, but it imposes, in the event of his non-approval, a necessity on the Legislature to reconsider every Bill or Joint Resolution returned, within the prescribed time, with his objections, and unless it passed by a vote of two-thirds of each House, the first expression in its favor by a majority of both branches is altogether negatived. It may, therefore, be conceded that these conjoint demands of the Constitution must be complied with to confer on a Bill (or Joint Resolution) the force and power of law.

This admission, however, is far from meeting the case before the Court. The material inquiry is not as to the formalities essential under the Constitution to give binding efficacy to an Act of the Legislature, but it is as to the proof by which the authenticity of the Act is to be established.

When offered in evidence, with the Great Seal affixed, with the signatures of the President of the Senate and the Speaker of the House subscribed in the Senate-House, and the approval of the Governor, is it to be received as a record importing finality, or is it open to change or correction by the Journals of the two bodies? The question is not only interesting, but important, and for the first time arises in the Courts of this State.

It may be proper, before entering into a discussion of the particular point submitted, to present the views which we entertain in

11A

regard to the distinction which, in our judgment, obtains between the
effect of the Journal, as evidence in relation to Bills required to
be passed only in conformity with the general provisions of the
Article already referred to, and those which can only have "the
force of law," through a vote of a fixed number of the two Houses,
(over a majority,) to be ascertained by a record or entry of the yeas
and nays, as in the passage of a Bill over the veto of the Governor,
or for the contracting of a public debt for defraying extraordinary
expenditures, (Art. IX, Sec. 7,) because, in those instances, the Con-
stitution demands that the required majority, by yeas and nays,
shall appear on the Journal.  The entry or record on the Journal
is made the condition on which the Act is to have effect, and, if the
requisition of the Constitution is not complied with, no matter in
what form the Act appears, it will want the essentials which are to
give it efficacy.

The Journal, in such cases, is constituted the medium of proof,
because the vote on the passage of the Bill, by the Constitution, is
to be entered upon it; and the highest evidence of the compliance
with that mandate is the production of the Journal itself.  Mr.
Cooley, in his Treatise on Constitutional Limitations, (page 135,)
says, "It will not be presumed, in any case, from the mere silence
of the Journal, that either House has exceeded its authority, or
disregarded a constitutional requirement in the passage of legisla-
tive Acts, unless where the Constitution has expressly required the
Journals to show the action taken, as, for instance, where it re-
quires the 'yeas and nays' to be entered."

The distinction for which we contend is founded in reason and
good sense.  The Journal, though purporting to be a minute of
the proceedings of the body, is, at best, but a very general, and
usually, a hasty history of them.  Though it is designed to follow
and record its daily action, yet the mode and manner in which
this is done are within the direction of the House, except where
the Constitution, in regard to Bills of a particular description, en-
joins that entries, of a specially designated character, shall be made.
Then the entry of the majority by which such measure is passed,
and the names of the members voting, and how voting, are to be
recorded as the mode of ascertaining if, within the meaning of
the Constitution, it has been adopted, and the entry itself is the
highest evidence of the compliance with the fundamental law.

In the *People* vs. *Purdy*, 2 Hill, 34, the question was, whether an
Act had received the assent of two-thirds of the members elected,

as required by the Constitution of New York. The Journals were received on that point. Bronson, J., said: "The Constitution is explicit in its terms, and, in a particular class of cases, upon which the Legislature may act, it denies to a bare majority of members the power which, in other cases, they undeniably possess. To give efficiency to this provision and secure the people against the exercise of powers which they have not granted, we must, I think, when called on to do so, look beyond the printed statute book, and enquire whether Bills creating or altering corporations have received the requisite number of votes."

We come now to the point made by the case before us. It is admitted that, before the "Act to revise, simplify and abridge the Rules, Practice, Pleadings and Forms of Courts of this State," passed on the 1st of March, 1870, the Circuit Court of the County of Barnwell was required to be held at Blackville. That, by the said Act, as enrolled, sealed and signed by the presiding officers of the two Houses, and approved by the Governor, the said Court for the said County was to be held at Barnwell. It is further admitted that the Journals of both Houses show that, as passed by the said Houses on the third reading, Blackville, and not Barnwell, was the place adopted.

It appears, also, from the return of His Honor, the respondent, who makes his order and judgment a part of his answer, that the " engrossed Bill," as it passed the two Houses, fixed Barnwell as the place at which the Court for the said County was to be held. The single question, therefore, for our decision is, whether the enrolled Act, so sealed, signed and approved, can be corrected by the Journals of the respective Houses?

A statute declares the legislative will. That is to be spoken through the forms prescribed by the Constitution. Even if the intention of the law-makers is ascertained beyond doubt, if it is not expressed in the manner provided by the fundamental law, from which alone it derives its authority to operate, it is void and of no effect, because wanting the formal characteristics necessary to impress it with the power of action on the community which it was intended to affect. Admitting the importance of form, and the necessity of adapting legislation to that mode and manner which are to give it shape, aspect and effect, still the question presented for our solution lies beyond the mere inquiry, whether, in a particular enactment, the directed form has been pursued.

It relates exclusively to the nature and character of the evidence

by which it is competent to show that the Act is not perfect and complete, because not passed (as it is averred) with due regard to the formalities which the Constitution provides as essential to invest it with the " force of law."

It will not be insisted that the well established rule of testimony, that the highest evidence of which the case is susceptible, has no application to legislative Acts. If it is held essential to the evolution of truth, in matters between individuals, where private rights alone are concerned, and where issues involving insignificant pecuniary amounts are to be decided, is it to be rejected and cast aside when the validity of a record is the gist of the issue?

The memorials of the proceedings of the Legislature are records, and are authentic beyond all manner of contradiction.—2 Gilbert, 7 ; 1 Phil. on Ev., 316.

Records are of so high a nature that, for their sublimity, they import verity in themselves, and none shall be received to aver anything against the record itself.—*Floyd* vs. *Barker*, 12 Coke Rep., 24.

The Journals of Parliament cannot weaken or control a statute which is a record, and to be tried only by itself.—The *King* vs. *Arundel, et al.*, Hob., 109.

The Journal is of good use for the observation of the generality and materiality of proceedings and deliberations as to the third reading of any Bill, intercourse between Houses, &c. ; but when the Act is passed the Journal is expired.—*Ibid.*

Does not the fact that it is a record impart verity, and exclude the idea that it can be tested or tried by anything but itself?

It may, however, be objected that the Journal, so far as it indicates the action and progress of the House, in regard to a Bill before it, would be without avail, and of no practical use, although required by the Constitution to be kept. The objection, when examined, will be found to be without reasonable ground. The Journal, so far as it exhibits the action of the House as to a particular Bill, is the medium through which the members are kept informed and advised of its progress, so that knowledge may be afforded of what action is required for its perfection. The very fact that the body converts the engrossed Bill into an enrolled one, through the proper Committee, affixes the Seal of the State, the signatures of the presiding officers, and presents it to the Governor for his approval, import that at least the mind of the General Assembly has agreed on a definite conclusion, and these formal acts speak the result.

Except where the entry on the Journal is *demanded* as one of the incidents indispensable under the Constitution to the perfection of an Act, it has "expired" when the sealing, signing, and executive approval, by their united operation, affirm that all constitutional requisitions have been fulfilled.

It is said that English authorities and precedents are not applicable, because our Legislature acts under a written Constitution, while Parliament is omnipotent.

It is not necessary to pursue the course and history of the English Parliament in regard to its mode and usage of legislation. It is enough to say that, at the adoption of our Constitution, the manner of that body, in the passage and enactments of statutes, in no essential mode differed from the course which the Constitution prescribed for the government of our own Legislature. Whether the forms observed and practiced in England are through written rules, or derive their force from long established usage, they scarcely vary, in any particular, from the requirements of our Constitution in regard to the passage of Bills. Even if they had not been incorporated into our Constitution, then, as Mr. Cooley well remarks, at page 130 of his work already referred to : "If, when the Constitution was adopted, there were known and settled rules and usages forming a part of the law of the country in reference to which the Constitution has evidently been framed, and these rules and usages required the observance of particular forms, the Constitution itself must also be understood as requiring them, because, in assuming the existence of such law and usage, and being framed with reference to them, it has, in effect, adopted them as part of itself, as much as if they were expressly incorporated in its provisions."

In fact, the Legislative Assemblies of the United States were all constituted upon the model of the two Houses of Parliament ; the forms and proceedings which prevail in the latter have been adopted by them as their common Parliamentary law.—Cushing on Law and Practice of Legislative Assemblies, Sections 215, 697, 777.

The House of Lords and the House of Commons each keep a journal of its proceedings ; the Bill, in both, is to be read on three separate days, and the concurrence of the three distinct bodies of which it is composed, (King, Lords and Commons,) each acting independent of the other, is necessary to the perfection of a statute.

When an Act is sent forth by our Legislature as completed by it; receiving the approval of the Executive, or, in the absence of it,. passed over his veto by the required majority in the form prescribed

by the Constitution, it is as potent and effective as an English statute, (each operating within its own territorial jurisdiction), unless it violates some prohibition by which the Legislature is interdicted, either by the Constitution of the State or of the United States, as, for instance, ·that it shall not impair the obligation of contracts.

Mr. Cushing, in his work, at page 120, says, "If a Bill which has been duly authenticated as having passed both Houses, receives the Executive approval, and is signed by him, it will become a law, notwithstanding the agreement of the two Houses is certified thereon by "mistake;" and, to sustain his position, he refers to *J. of H.,* 23*d Congress,* 2*d Ses.,* 433, 434; *J.* of *S.,* 23*d Congress,* 2*d Ses.,* 162.

In *Section* 2404, he proceeds to shew how, "after a Bill has passed through all its regular stages in either House, for that House to discover that an amendment to the Bill has been improperly adopted or rejected, and to desire a correction of the erroneous vote," and concludes, the "mistake" may be corrected by a re-consideration, so as to reach the stage at which the amendment was voted upon, and then to pass upon it.

It appears not to have entered into the contemplation of either House of any legislative assembly, to correct the mistake by the Journal, when the Bill had passed through "all its regular stages." It surely would appear to be more competent for a House to correct its error by its own Journal, than for a Court to do so, after the Bill had been converted into an Act, ratified by the signing and sealing, and approved by the Governor.

In the case of *Hunt* vs. *Van Alstyne,* 25 Wendell, 610, Nelson, C. J., a Judge distinguished for his learning, accurate conception and sound judgment, although the point was not necessary for the decision of the cause, expressed himself as to the character of the proof afforded by the certificate of the presiding officers, to a Bill even required to be passed by a two-third vote, and to be so certified. On the said page, he says: "But suppose it (the certificate) did appear—would it be conclusive? It seems to me it would be so. There are only two modes of contradicting it: 1. By the Journals of the two Houses; and, 2. By parol testimony. The presiding officer had all the benefit of the first; the ayes and noes are taken, and the Journal made up under his supervision and control. His means of ascertaining and determining the fact, when he declares the law to be passed, exceed those of any other tribunal that might

afterwards be called upon to inquire into it. Besides, the hurry and looseness with which the Journals are copied, and the little importance attached to the printed copies, necessarily impair confidence in their correctness. They are most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions. As to the second mode of contradicting the certificate, the evidence would, if possible, be still more fallible and unsatisfactory."

It is true the case, as adjudged, did not turn on the point to which he so addressed himself, although it incidentally arose, but the opinion of so eminent a jurist, arrived at apparently with deliberation, is entitled to much consideration and respect.

In *Pacific Railroad Company* vs. *The Governor*, 23 Miss., (2 Jones,) 353, it was held, that the statute roll is the absolute and conclusive proof of a statute, and resort cannot be had to the Journals of the Legislature to impeach the validity of the law by shewing that in its passage some of the forms prescribed by the Constitution were not observed.

In *Binney's* case, 2 Bland., 99, it was ruled, that no parol proof, nor any part of the proceedings of either branch of the Legislature, can be admitted to explain the language of an Act of Assembly, except as to private Acts, in which there may be a latent ambiguity.

The object of the *mandamus* is, in effect, to strike from the Act "Barnwell," as the place for holding the Court for that County. If it had so happened that the seat of justice for the County was, for the first time, to be fixed by law, the result would be to deprive the County of the very privilege it was intended to confer, for no place being then indicated, it would be left without the power of holding a Circuit Court, through which justice could, by law, be administered within its limits. It is not pretended that the Journals are of such potent efficacy that, through their aid, another place could be substituted in the stead of the one to be erased. Indeed, no objection is urged even to this course, except that the Act so amended by the Court would not then be the Act which had been signed by the respective presiding officers, and approved by the Governor, thus admitting, at least by implication, the force and effect which these signatures afford.

Suppose Blackville had been the place named in the enrolled Act when it was presented to the Governor for approval, is it not fair and reasonable to conclude that, preferring Barnwell, in his

judgment, as the County seat—for he thus indicated by his signature—he would have returned it with his objections, and so, possibly, the very word or clause which the Court is to strike out may be the identical one which saved the Bill from the Executive veto.

It was admitted, in the argument, that the material question with the Legislature, in regard to this Section of the Bill, was as to the County seat for Barnwell. The views of the General Assembly differed as between Barnwell and Blackville. No intimation of choice of another place was made. Then if, at the time of the introduction of the Bill, Aiken had, by law, been fixed as the seat of justice for the County, the effect of the erasure of Barnwell by the Court would continue Aiken as the place, which, so far as could be ascertained from the discussion in the Legislature, was not in the contemplation of a single member.

It is submitted that the Journal is to correct the enrolled Act, (properly enrolled by and from the engrossed Act, under the supervision of the Standing Committee charged with that duty,) sealed, signed and approved, as the Constitution required, by striking out Barnwell. Is this to give truth and efficacy to the Act? The Journal will not perform the duty which is exacted of it if it falls short of accomplishing what it is proposed to do by its aid, to make Blackville the place really intended by the Legislature, and under the force and power of *this Act.*

The question is one of evidence, whether the statute is to prevail, or whether it is to be overcome by the Journals? If the latter are to predominate, then the most solemn of records is to be controlled and deprived of the purpose it was designed to effect by testimony lower and inferior in degree. Suppose, however, that the Journals are to be viewed in the light of records; where they are not required by the Constitution to shew that its demand, as to particular subjects and modes of legislation, has been respected and obeyed, is it competent to correct one record by the force and effect of another? Are not the use of, and purpose of, the Journals exhausted, when the Act is enrolled, sealed, signed and approved, except when they are made, by the Constitution, the evidence of a compliance with its specific requirements?

I shall purposely refrain from discussing the effect of this interpolation. Whether, ignoring the official Acts of the presiding officers of the two Houses, the seal and approval of the Governor, as to the particular matter in hand, invalidates the whole Code, is too important and serious a point to be decided, unless specially made by the

pleadings. When that question shall be in proper form brought before the Court, I prefer to adjudicate it, without an intimation of opinion not necessary for the decision of the case now before us.

I have also withheld my views as to the right of the Court to issue the writ against the Circuit Judge in a matter probably arising in the exercise of his official functions, to be decided by his judgment, which, if erroneous, could only be corrected by appeal, because his counsel waive any question of that character, desiring a decision on the material point submitted.

To issue the writ, holding that the enrolled Act, sealed, signed and approved in the manner required by the Constitution, can be controlled by the Journals, is to my mind establishing a precedent fraught with danger, opening a door to frauds of the most pernicious consequence, because affecting the legislation of the country, and without a single authority of a decided case submitted in the argument on the part of the relator.