# STATE EX REL. CHARLES FOSTER v. ARTHUR NAFTALIN AND OTHERS.[1]

January 20, 1956.

No. 36,749.

[1]Reported in 74 N. W. (2d) 249.

*Miles Lord,* Attorney General, *Lowell J. Grady,* Deputy Attorney General, and *Joseph J. Bright,* Assistant Attorney General, for appellants.

*Harry H. Peterson* and *Leonard Frank,* for respondent.

KNUTSON, JUSTICE.

This proceeding originally was commenced as an action for a declaratory judgment seeking a determination of the constitutionality of L. 1955, c. 857, and an injunction restraining defendants from acting thereunder. While a motion for a temporary injunction was pending, the parties, by stipulation, converted the action into a proceeding in quo warranto for the purpose of speedily testing the right of defendants Arthur Naftalin, Arthur Hansen, and Morris Hursh to hold and exercise respectively the offices of secretary of the State Executive Council, secretary of the State Investment Council, and secretary of the State Board of Pardons. The trial court determined that the act was unconstitutional, and this appeal followed.

There is no dispute as to the facts. L. 1955, c. 857, was first introduced in the house as House File 1233 on March 7, 1955.[2] The bill was a comprehensive reorganization of many of the departments of government. After its introduction it was reported back by the committee on civil administration with certain amendments with its recommendation that it pass.[3] As so reported for passage, article X read in part as follows:[4]

[2]Journal of the House, 1955, p. 835.
[3]Journal of the House, 1955, p. 1672.
[4]Journal of the House, 1955, p. 1693.

"Section 1. Subdivision 1. Except as otherwise provided in this section and except as to other powers and duties of the state auditor, which by this act are transferred to, vested in, and imposed upon other state departments or agencies, all the powers and duties now vested in, and imposed upon the state auditor by statute are hereby transferred to, vested in, and imposed upon the commissioner of administration.

"Subd. 2 The state auditor shall continue to exercise the rights, powers and duties which heretofore have been or may hereafter be by law vested in, and imposed upon him relating to certifying the state tax to the several county auditors, relating to certifying the tax necessary to be levied in connection with any loans made by the state board of investment as heretofore constituted or in respect to any obligations purchased by such state board of investment, or in any other way relating to the certification and levy of taxes for any purposes for and on behalf of the state of Minnesota.

"Subd. 3 Subject to the provisions of this act and other applicable laws, Minnesota Statutes 1953, Section 6.02 shall continue in full force and effect.

"Subd. 4 The auditor shall continue as a member of the state executive council, the land exchange commission, and the state board of investment as heretofore constituted."

The recommendation of the committee was adopted by the house.[5] Article X of the bill thereafter was amended as follows:[6]

"In Article X, strike Section 1 and insert in lieu thereof the following:

" 'Section 1. All the powers, duties and responsibilities now vested in or imposed upon the state auditor relating to the keeping of the general books of account of the state and the keeping of a system of uniform records and accounts are hereby transferred to, vested in and imposed upon the commissioner of administration. The auditor shall continue to perform the duties of preauditing and all other duties now imposed upon him by law and not transferred to the

---

[5]Journal of the House, 1955, p. 1698.
[6]Journal of the House, 1955, p. 2111.

commissioner of administration by this act. The auditor shall comply with the system of accounts and records prescribed by the commissioner of administration and shall at all times have access to the general books of account of the state.' "

As so amended, it was passed by the house on April 15, 1955.[7]

Insofar as the text of the bill as so amended and approved by the house is concerned, it is of little importance here except to indicate what the position of the house was in the enactment of this bill.

The bill was sent to the senate on April 16. It was considered by the senate as a special order on April 19, at which time 11 amendments were proposed and passed, including an amendment to article X,[8] which was as follows:

"In Article X * * * strike all of Section 1 as amended and insert in lieu thereof the following:

" 'Section 1. All the powers and duties now vested in or imposed upon the state auditor relating to the keeping of the general books of account of the state are hereby transferred to, vested in, and imposed upon the commissioner of administration. The auditor shall continue to perform the duties of preauditing and shall maintain such control records and accounts as these duties require. *The commissioner of administration after consultation with the auditor and the post-auditor, as now or hereafter constituted by law, shall formulate and prescribe for all departments and agencies of the state a system of uniform records, accounts and procedures with suitable instructions governing the installation and use thereof.* The auditor shall at all times have access to the general books of account of the state. The commissioner of administration shall at all times have access to the files and records of the auditor.' "  (Italics supplied.)

This amendment will be referred to hereafter as amendment No. 1.

Immediately after the adoption of amendment No. 1, article X of the bill was further amended as follows:

---

[7] Journal of the House, 1955, p. 2115.

[8] Journal of the Senate, 1955, p. 2004.

"In Art. X, strike Section 1, as amended, and insert in lieu thereof the following:

"Section 1. All the powers and duties now vested in or imposed upon the state auditor relating to the keeping of the general books of account of the state are hereby transferred to, vested in, and imposed upon the commissioner of administration. The auditor shall continue to perform the duties of preauditing and shall maintain such control records and accounts as these duties require. *The state auditor, with the advice and assistance of the commissioner of administration and the post-auditor as now or hereafter constituted by law, shall formulate and prescribe for all departments and agencies of the state a system of uniform records, accounts and procedures with suitable instructions governing the installation and use thereof.* The auditor shall at all times have access to the general books of account of the state. The commissioner of administration shall at all times have access to the files and records of the auditor." (Italics supplied.)

This amendment will be referred to hereafter as amendment No. 2.

The house refused to concur in the senate amendments[9] and requested that a conference committee be appointed. Pursuant to that request a conference committee was appointed by both houses, after which the conference agreed to certain amendments not pertinent here,[10] and thereafter the house accepted and passed the bill with article X as amended by the senate.[11]

Due to a mistake on the part of the enrolling clerk, or someone else, the bill as transmitted to and signed by the governor included amendment No. 1 instead of amendment No. 2. Amendment No. 1 was never passed by the legislature.

The trial court held that the variance between the bill as passed by the legislature, containing amendment No. 2, and the bill as presented to the governor, containing amendment No. 1, was a material

[9]Journal of the Senate, 1955, p. 2025; Journal of the House, 1955, p. 2353.

[10]Journal of the Senate, 1955, p. 2278.

[11]Journal of the House, 1955, p. 2609.

variance and that, as a result, the entire bill failed to become a law and is void.

It is the position of appellants (1) that the variance is not a material variance, and (2) that, if it is a material variance, § 1 of article IX,[12] in which the variance occurs, is severable from the rest of the act.

■ A determination of the issues involved in this case requires an interpretation of Minn. Const. art. 4, § 11, which, as far as material here, reads:

"Every bill which shall have passed the Senate and House of Representatives, in conformity to the rules of each house and the joint rules of the two houses, shall, before it becomes a law, be presented to the governor of the State. If he approves, he shall sign and deposit it in the office of secretary of state for preservation, and notify the house where it originated of the fact. But if not, he shall return it, with his objections, to the house in which it shall have originated; when such objections shall be entered at large on the journal of the same, and the house shall proceed to reconsider the bill. If, after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and if it be approved by two-thirds of that house it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the persons voting for or against the bill shall be entered on the journal of each house, respectively. If any bill shall not be returned by the governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the legislature, by adjournment within that time, prevents its return; in which case it shall not be a law. The governor may approve, sign and file in the office of the secretary of state, within three days after the adjourn-

---

[12]Article X as the bill originally was drafted was later changed to article IX, and the pertinent article will be referred to hereafter as article IX as it is in the final bill.

ment of the legislature, any act passed during the last three days of the session, and the same shall become a law."

It is apparent from this constitutional provision that a bill remains in an embryonic state and does not become a law until three things occur, namely, passage by both houses of the legislature and approval by the governor, either by signing or by the constitutional lapse of time, unless it is passed over his veto by two-thirds of both houses of the legislature. In considering the issues before us, it becomes important, therefore, that we keep in mind the distinction between a *bill* and a *law*. A *bill* never becomes a *law* until all the constitutional prerequisites respecting manner of enactment have been fully complied with.

Another rule that we should have in mind, which is not disputed here, is that Minnesota is firmly committed to the so-called "journal entry rule," under which the journals of the legislature may be examined in order to ascertain whether the constitutional prerequisites to the enactment of a law have been complied with. We have followed the journal entry rule ever since Board of Supervisors v. Heenan, 2 Minn. 281 (330). See, Bull v. King, 205 Minn. 427, 286 N. W. 311.

On the question of the materiality of the variance involved, appellants first contend that, inasmuch as the material portions of the two amendments require concurrence of the commissioner of administration and auditor with the post-auditor in amendment No. 1 and the auditor and commissioner of administration and post-auditor in amendment No. 2 and that § 2 of article IX provides as follows:

"The office of legislative post-audit is created in the legislative branch of the government. The method of appointment of the director of this office, his qualifications, his compensation, his term of office, provisions for his removal and definition of his duties will be established by concurrent resolution of the legislature,"

the portions of the act involved have no significance because the legislature failed to appoint a post-auditor as provided by § 2. They argue

that it was the intention of the legislature that the matter of the formulation and prescription of a system of uniform records should rest with three officers, namely, the state auditor, the commissioner of administration, and the post-auditor; that, inasmuch as the legislature failed to provide a post-auditor, "Therefore, even if the bill had been correctly enrolled, the sentence in which this variance occurs would be incapable of execution in accordance with the legislative intention"; consequently, that the variance cannot be of any materiality.

Of course, the argument overlooks the fact that the act provides for a post-auditor "as now or hereafter constituted by law." If we were to hold with appellants on this contention, the legislature at the next session could conceivably provide a post-auditor, thereby rendering what had been an immaterial variance, according to appellants' argument, a material one. To now hold the act constitutional on that ground well might lead to much chaos were we later to be compelled to hold that the variance had then become material when a post-auditor was provided. The decision should not be placed on such a tenuous basis.

Furthermore, we think that the legislature itself has determined the materiality of the variance. When the bill was amended by the senate, the house refused to concur in the amendment. Had the matter remained there, the bill in its entirety in all probability would have been defeated. Only after a conference committee had recommended passage of the senate amendment did the house concur. If, as appellants contend, the variance was immaterial, it is difficult to understand how the two houses of the legislature would differ so emphatically upon the two versions of the bill.

In Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625, the then attorney general of this state was on the opposite side of this question. The brief of the attorney general in the presentation of that case here contained the following apt statement:[13]

---

[13]Appellants' Brief, p. 16, Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625.

"* * * In fact, it has been held that a variance *which relates to the amendment of a bill* is, without argument, material. The courts in such cases will not even speculate as to the materiality of the amendment. The reason for the rule is that if the matter constituting the amendment were not material, the legislature would not have bothered to amend it." (Italics supplied.)

Cited in support of this statement we find the cases of Mayor and Aldermen of West End v. Simmons, 165 Ala. 359, 51 So. 638, and Moog v. Randolph, 77 Ala. 597. In the West End case, the court said with respect to the materiality of an amendment (165 Ala. 360, 51 So. 638) :

"* * * it would not become our office to speculate upon the degree of importance attached to it in the legislative mind."

We think that it generally is the rule that, where the variance relates to an amendment included in or omitted from the bill passed, the variance is material as a matter of course. Certainly that is true where the two houses reach an impasse on the amendment as they did here.

■ Appellants next argue that the variance becomes immaterial when L. 1955, c. 857, is considered with c. 863. Chapter 863 originated as S. F. 726. It was introduced on February 16, 1955,[14] quite some time prior to the introduction of H. F. 1233. It was passed by the senate on March 10[15] and was transmitted to the house on March 11.[16] It was passed by the house on April 20,[17] the same day on which H. F. 1233 was passed. Both bills were approved by the governor on April 21.[18]

Chapter 863 deals with the powers and duties of the state auditor. The portion of it material here is that which amends M. S. A. 1953, § 6.21, with respect to the duties of the auditor. It reads:

[14]Journal of the Senate, 1955, p. 368.

[15]Journal of the Senate, 1955, p. 701.

[16]Journal of the House, 1955, p. 966.

[17]Journal of the House, 1955, p. 2475.

[18]Journal of the Senate, 1955, p. 2295; Journal of the House, 1955, p. 2676.

"Sec. 15. Minnesota Statutes 1953, Section 6.21, is amended to read:

"6.21 **Duties.** The state auditor shall continue to exercise the rights, powers, and duties now vested in and imposed upon his office. He shall have charge of the administration of the financial affairs of the state. He shall keep the general books of account of the state. The general books of account shall be on a double entry control basis, with such revenue, expenditure, asset and liability accounts as will give complete control over all financial and expenditure operations of the state and over all officials, departments, and agencies of the state government. Accounts shall be set both as to expenditures and revenue according to generally accepted practice in governmental accounting. The auditor, with the advice and assistance of the commissioner of administration and the public examiner, shall formulate and prescribe for all departments and other state agencies a system of uniform records, accounts, statements, estimates, revenue receipt forms, vouchers, bills, and demands with suitable instructions governing the installation and use thereof. The accounting system and form so prescribed shall be adopted and employed by all officials, departments, and agencies of the state government. The auditor, with the assistance of the public examiner, shall exercise constant supervision and control thereof. All accounting and financial records shall be kept on the fiscal year basis of 12 months ending at midnight between June 30 and July 1. The auditor and his designated agents shall at all times have free access to the books, records, accounts, and papers of the several departments and agencies. The commissioner of administration and his designated employees shall have free access at all times to the books, records, accounts, and papers of the state auditor and the auditor shall allow the commissioner and his agents sufficient desk space for using and inspecting the same."

It is the contention of appellants that c. 863 dealt with the same matter as c. 857, art. 9, § 1, and that it, being the later of the two laws, is controlling under M. S. A. 645.26, subd. 3, which reads:

"When the provisions of two or more *laws passed* during the same session of the legislature are irreconcilable, the *law* latest in date of *final enactment,* irrespective of its effective date, shall prevail from the time it becomes effective, except as otherwise provided in section 30." (Italics supplied.)

This rule was construed with respect to acts passed at the same time and approved at the same time by the governor in Syndicate Printing Co. v. Cashman, 115 Minn. 446, 450, 132 N. W. 915, 916, where we said:

"* * * Chapter 221, though approved on the same day as chapter 203, is presumed to be the later enactment, as it is presumed that the acts were approved in their numerical order.[19] If, therefore, the two acts are inconsistent, chapter 221, being the latest expression of the legislature on the subject, operates as a repeal by implication of the *prior inconsistent law,* and must be given effect." (Italics supplied.)

The difficulty with this argument and the application of this authority is that it presupposes that H. F. 1233 became a law. M. S. A. 645.26, subd. 3, likewise deals specifically with "two or more laws passed during the same session." If H. F. 1233, because of a material variance, never became a law, the rule is wholly inapplicable. If the contention of appellants were tenable, it would mean that, if H. F. 1233 had been passed as it was, and approved by the governor, with the same variance as we are now confronted with, at an early part of the legislative session, it would be unconstitutional when passed and would not become a law. If, then, c. 863 were passed at a later time during the session, according to appellants' argument, it would in some manner breathe life into the bill that had never been born. If, on the other hand, c. 863 had been approved a day before H. F. 1233, it would not correct the constitutional defect existing in it at all. We believe that it is evident that c. 857 must stand on its own feet or fall and that passage of c. 863 could in no manner bring it to life if it was constitutionally defec-

---

[19]For a contra view, see Stuart v. Chapman, 104 Me. 17, 70 A. 1069.

tive, nor could c. 863, even though dealing with the same subject, change the fact that the bill signed by the governor was not the bill passed by the legislature. The bill never having become a law, there is no law to repeal by implication.

■ We come then to the second and more serious contention of appellants, namely, that, even if L. 1955, c. 857, art. 9, § 1, is invalid, we should apply the rule of severability and sustain the balance of the act. This question has been determined twice adversely to the contention of appellants—in Bull v. King, 205 Minn. 427, 286 N. W. 311, and Freeman v. Goff, 206 Minn. 49, 287 N. W. 238. Inferentially at least, it has been determined the third time in Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625. Appellants seek to avoid the effect of these decisions upon the ground (1) that the Freeman case is distinguishable from the instant case, and (2) that the Freeman case should be overruled (a) because it is contrary to the great weight of authority; (b) because it is inconsistent with the purpose of the statutory rule of severability encompassed by M. S. A. 645.20; and (c) because there is no sound reason for the rule.

At the outset, while appellants argue that Freeman v. Goff, *supra,* is the first case where the rule of nonseverability was adopted by this court, it is clear that a reexamination of this question requires an examination of Bull v. King, *supra,* as well. Appellants contend that the authorities cited in support of the rule of nonseverability in the Bull case do not support that rule. In view of the important public issue involved, we have reexamined all authorities cited in the Bull case, as well as all records and briefs in the Bull, Freeman, and Minnesota Mutual cases, and from such examination we are convinced that every argument now advanced and nearly all the authorities cited by appellants in support of the rule of severability were thoroughly presented and considered in those cases and rejected by us.

In seeking to distinguish the facts in the Freeman case from those now before us, appellants argue:

"The Goff case involved a variance in L. 1939, c. 444 entitled: 'An act relating to signs advertising intoxicating liquors and non-intoxicating malt liquors; and providing penalties for violations thereof.' The legislative act involved in the Goff case related only and exclusively to signs advertising intoxicating and nonintoxicating malt liquors. The bill as there enrolled and signed by the governor contained a spurious provision, not passed upon by the legislature. The Court found that the spurious addition so greatly extended the coverage of the act as passed by the legislature that the variance was a vital and material one and that the rule of severability did not there apply. The spuriously added provision there was clearly integrated with and related to and connected with the entire subject of the rest of the act. In the instant case that situation does not exist. As heretofore pointed out, the Reorganization Act is composed of 10 separate and distinct articles, and, while all of the articles may be said to be parts of a general system of state government, yet those different parts, in respect to their operation, have no legal connection with each other, and each of its provisions other than the provision in which the variance occurs is complete in and of itself and is capable of being executed in accordance with the legislative intent, apart and separate from § 1 of art. IX of the Act, wherein this variance occurs."

Literally speaking, that statement may be true as to Freeman v. Goff, *supra*, alone, although an examination of the arguments presented in that case could hardly lead to that conclusion. It surely is not true as to the Bull case. That case involved the constitutionality of L. 1939, c. 446. The trial court upheld the constitutionality of the act on the ground, first, that the variance in the bill could be stricken as meaningless, and second, that the rule of severability should apply even if the one section should be held invalid. The nature of the bill is best described by respondent in his brief here in that case, as follows:[20]

"The act is divided into 24 sections, whose only relation to each other is that each involves an amendment of the existing income tax

[20]Respondent's Brief, p. 24, Bull v. King, 205 Minn. 427, 286 N. W. 311.

law. A brief summary of the sections and their subject matter will show their lack of relation. Sections 1 and 2 relate to exemptions. Section 3 relates to personal credits. Section 4 relates to accounting periods for the determination of gross income. Sections 5 and 6 relate to exclusions from gross income. Section 7 relates to deductions. Sections 9, 10, 11 and 12 relate to income of estates or property in trust and the taxation thereof. Section 13 relates to the treatment of credits to partners. Section 14 relates to periods of limitation upon the assessment and collection of tax. Section 15 relates to claims for refund and the payment thereof. Section 16 repeals a superfluous penalty provision. Section 17 relates to procedure and forms. Section 18 relates to settlement agreements. Section 19 amends the refund provision by adding a subsection c-1 under which the plaintiff is here proceeding. Section 20 preserves previous law as to previously incurred taxes, etc. Section 21 relates to the Tax Commission's examination of returns and assessment of taxes and provides a period of limitations for refunds. Sections 22 and 23 deal with the allocation of income to Minnesota. Section 24 provides for the effective date of the act.

"All of these sections, except section 8, were presented to the governor in the identical form in which they were passed. Because a clerk erred in copying section 8, should all of the other amendments, many of them of major importance, be defeated? Must the entire purposes of the legislature be frustrated because an event beyond its control has caused doubt as to whether it did or did not repeal a credit given to a special class of taxpayers?"

The question of severability was thoroughly presented, not only by able counsel for the parties, but by a brief filed amicus curiae by the attorney general. The attorney general urged the court to adopt two rules, namely, the enrolled-bill rule and the rule of severability. We rejected both. With respect to the rule of severability, we said (205 Minn. 431, 286 N. W. 313):

"The bill presented to the governor for his approval must be the same bill which was passed by the legislature. This requirement is mandatory. If there is a material variance between them the bill

presented to the governor cannot be said to be the same bill which was passed by the legislature. In that situation he approves not a bill passed by the legislature, but another. A material variance between the bill passed by the legislature and that approved by the governor *invalidates the entire enactment.*" (Italics supplied.)

Shortly after our decision in the Bull case, Freeman v. Goff, 206 Minn. 49, 287 N. W. 238, came before us. That case involved the validity of L. 1939, c. 444. There the trial court held the act unconstitutional. Again the main contention was that, even though a part of the act was invalid, the balance should be sustained under the rule of severability. Again, many of the cases now cited as authority for that rule were cited and considered by us and again rejected. Here, too, a brief amicus curiae was filed by able counsel discussing the severability rule. It is true that the act itself involved only five sections and that it did not involve as many sections as in the Bull case or in the instant case, but the same arguments were advanced for sustaining that part of the act not affected by the variance as were advanced in the Bull case and as are advanced here. Again we said in the Freeman case (206 Minn. 53, 287 N. W. 241) :

"'* * * a material variance prevents any part of the act from ever becoming a statute. *The subdivisions of an act are but parts of the whole.* [Italics supplied.] Under our constitution (art. 4, § 11), 'every bill * * * passed * * * shall, *before it becomes a law,* be presented to the governor' for approval. * * * Here it is apparent that the bill as passed by the legislature has never been presented to the governor nor approved by him. Without such presentation and approval it cannot become a valid law. And, the variance being a material one, the rule announced in Bull v. King, *supra,* and the cases cited to sustain that view is that [205 Minn. 431, 286 N. W. 313], 'a material variance between the bill passed by the legislature and that approved by the governor invalidates the entire enactment.' "

In Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625, the question of severability was not directly involved, but it was argued by the attorney general in seeking and obtaining a

reversal of the trial court's determination. In appellants' brief, submitted by the attorney general in that case, we find the following as one of his contentions:[21]

"If there is a material variance between the bill passed by the legislature and that signed by the governor, the entire enactment is void."

In that case, where the attorney general was on the opposite side of the question from that on which he now appears in this case, the Bull and Freeman cases are relied upon in support of the above statement. With respect to this contention, we said (212 Minn. 574, 577, 4 N. W. [2d] 626, 627):

"It is clear that amendments numbered 2, 8, and 10 are material, and if any one of the three was not in the bill when it passed, but now appears in the enrolled bill approved by the governor, there is a fatal variance. * * *

\* \* \* \* \*

"The court concludes that the journal, and the engrossed bills and enrolled bill disclose that the omission to delete the lines by amendment No. 8 to H. F. No. 767 was a clerical error of the engrossing staff of the senate and vitiates L. 1941, c. 218."

The attorney general said also in the Minnesota Mutual case:[22]

"It is lamentable that errors on the part of legislative clerks should defeat the action of the legislative bodies. But the strict rule calling for absolute compliance with constitutional requirements is, in the long run, a good one. In some cases it may work a hardship, but, by and large, it is beneficial to democratic government."

It can hardly be contended that we should adopt the rule of severability as to bills having numerous sections and the rule of non-severability as to those having fewer sections. Either the rule should be adopted as the law in this state, applicable to all bills that meet

[21]Appellants' Brief, p. 20, Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625.

[22]Appellants' Brief, p. 21, Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625.

the test of severability, or it should not be adopted at all. We fail to see any distinction between the Bull and Freeman cases and the one now presented, nor do we see any distinction between the arguments advanced in support of the rule of severability in these cases.

Appellants next argue that the rule of Freeman v. Goff, *supra,* should be overruled because it is contrary to the great weight of authority. While we are doubtful that it is against the weight of authority, this argument has been considered thoroughly in the Bull and Freeman cases. The authorities relied upon by appellants have been rejected in those cases. Some 20 or more states apparently follow the enrolled-bill rule under which the question of severability is never reached. It cannot be said that those states support the rule of severability. If they were to adopt the journal entry rule, we have no way of knowing whether they would adopt or reject the rule of severability. Be that as it may, the Freeman case is no more against the weight of authority now than it was when we decided the case. The general rule applicable to this situation is stated in 50 Am. Jur., Statutes, § 97, as follows:

"Presentation of the bill to the governor is one of the steps necessarily involved in the enactment of a law, since it is a common constitutional provision that every bill passed by the legislature shall, before it becomes a law, be presented to the chief executive for his approval or rejection. Such a provision is regarded as ·mandatory. The bill presented to the chief executive for his approval must be the same bill which was passed by the legislature. If there is a material variance between them, the bill presented to the chief executive cannot properly be said to be the same bill which was passed by the legislature, and *the entire enactment is generally regarded as invalidated.* Absolute correspondence, however, is not required; minor discrepancies and clerical errors which do not change the substance and legal effect of the statute will be disregarded." (Italics supplied.)

Bull v. King, *supra,* is cited in support of the above text.

In 82 C. J. S., Statutes, § 60b, we find the following:

"The enrolling clerk or committee has no power or authority to modify in any respect a bill passed by the legislature. In those jurisdictions where the enrolled act is not regarded as conclusive as to the existence and contents of the bill, as discussed infra § 83, it is generally held that the enrolled bill as presented to, and approved by, the governor must be the same as that passed by the legislature, at least in substance and in legal effect; and where, through some mistake in the enrollment of the bill, a material change has been made, or an altogether different bill is presented to, and signed by, the governor, *it does not become a law;* nor, it has been held, will a bill become law where a serious clerical error occurs." (Italics supplied.)

The Freeman and Minnesota Mutual cases are cited in support of the above text.

It must be conceded that there are authorities supporting both views. We have heretofore considered these authorities and have accepted those rejecting the rule of severability.

Appellants next argue that Freeman v. Goff, *supra,* should be overruled because it is inconsistent with M. S. A. 645.20, which reads:

"Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."

Here, again, the statute deals with a *law,* not a *bill.* As we pointed out above, a bill does not become a law until the constitutional prerequisites have been met. Where there is a material variance as here,

under our constitution the bill does not become a law. This question also has been effectively answered in the Freeman case. In that case, L. 1939, c. 444, § 4, read:

"The various provisions of this Act, and the clauses, phrases and sentences thereof, shall be severable, and if any part or provision thereof shall be held to be invalid, it shall not be construed as invalidating any other portion thereof."

In spite of that express provision in the act itself, we held that the whole act was void on the ground that it had never become law. Surely such provision in the act itself is more persuasive than a statute of general application.

The next argument is that Freeman v. Goff, *supra,* should be overruled because there is no sound reason for it. Appellants rely heavily on People ex rel. Honore v. Olsen, 222 Ill. 117, 78 N. E. 23, and People ex rel. Brady v. LaSalle Street T. & S. Bank, 269 Ill. 518, 110 N. E. 38. All that need be said about those cases is that they have been thoroughly considered in the Bull and Freeman cases, in both of which we refused to follow the Illinois cases. The argument here is based on the proposition that, inasmuch as we follow the rule of severability in cases where the constitutional prerequisites to enactment of a law have been followed but where parts of the act are unconstitutional for some other reason such as failure to comply with Minn. Const. art. 4, § 27, no good reason exists for application of a different rule here. Of course, the answer to this argument is that in the one case the bill becomes a law and in the other case it does not. The rule is almost universal that, where the law is constitutionally enacted but some part of it contravenes some constitutional provision, parts of the act which can stand alone will be upheld.[23] It does not follow that, where a bill never has become a law for failure to follow constitutional mandates in the process of enactment, a part of it can be sustained.

Again this distinction has been considered in the Bull case. On page 35 of appellants' brief here we find the following:

---

[23] 11 Am. Jur., Constitutional Law, § 152.

"There are at least two situations where a court is called upon to declare that a statute, or a portion thereof, is invalid under a constitution. The first, and most frequently occurring one, arises where the terms of the statute conflict with some provision of the constitution, as, for example, the equal protection clause. The second arises where the method of enactment does not meet the constitutional requirements. This case falls within the latter category, since it is contended that § 1 of art. IX of the Reorganization Act, as passed by the legislature, was never presented to the governor under art. 4, § 11, of the Constitution.

"In each case the legislature has passed an act which is intended to be operative as law in its entirety, but a portion of which is invalid. In each case the question before the Court is: Because a portion of this act is invalid, shall we declare the entire law inoperative?"

This statement is taken verbatim from the brief of respondent in the Bull case, with the exception that the words "§ 1 of art. IX of the Reorganization Act" are substituted for the words "section 8 of the bill."[24]

In Freeman v. Goff, *supra*, this question again was clearly considered, as is illustrated by the following statement found in the brief of the attorney general appearing for appellants:[25]

"We submit that to limit the application of the divisibility rule to questions involving particular constitutional limitations to the power of the legislature is unsound. If the defective provisions of section 1 of Chapter 444 were invalid because of violation of the due process clause in section 7, Article I of the Minnesota State Constitution, it would seem clear that the remainder of Chapter 444 would be valid. We respectfully submit that no sound distinction can be predicated upon the fact that in the hypothetical case above supposed, the vice arose because of a violation of section 1, Article 7, whereas in the case at bar the vice arose because of a violation of section 11, Article 4. In each instance the validity of the remainder of the law

[24]Respondent's Brief, p. 26, Bull v. King, 205 Minn. 427, 286 N. W. 311.
[25]Appellants' Brief, p. 10, Freeman v. Goff, 206 Minn. 49, 287 N. W. 238.

depends upon whether the invalid portion is divisible or separable from the valid portions thereof."

This distinction was not overlooked by us in the Freeman case. We there said (206 Minn. 53, 287 N. W. 241) :

"The argument that a variation is not different from an unconstitutional provision which may be stricken from a statute and yet leave the remainder intact falls because it ignores the fact that the unconstitutional provision exists in a statute validly enacted, while a material variance prevents any part of the act from ever becoming a statute."

Appellants contend that the cases cited in support of the rule of nonseverability in Bull v. King, *supra,* do not support that rule. From a reexamination of those cases we think that it might be said that they do not specifically discuss the rule of severability. That is true of our early cases. In Sharp v. Merrill, 41 Minn. 492, 493, 43 N. W. 385, we held that the variance involved was not material. We there said :

"* * * An omission of words from the enrolled bill, which does not change the substance or legal effect of the statute as it passed the legislature, is wholly immaterial."

We did not state what the result would be if the omission did change the substance or legal effect of the statute.

Sjoberg v. Security Sav. & Loan Assn. 73 Minn. 203, 75 N. W. 1116, involved an act in which the enacting clause was omitted, contrary to Minn. Const. art 4, § 13. We held the constitutional requirement mandatory and that a statute without an enacting clause is void. With respect to Minn. Const. art. 4, § 11, we had this to say (73 Minn. 214, 75 N. W. 1118) :

"It is * * * claimed by appellant that the law in question contained an enacting clause at the time it passed the legislature, and that the trial court erred in excluding evidence of such fact. The ruling was correct, for the fact itself was immaterial for the reason that a bill, although it passes the legislature, *never becomes a law,* unless it be presented to the governor pursuant to article 4, § 11, of

the constitution. If the bill in question contained an enacting clause when it passed the legislature, it was never presented to the governor, but in place of it a bill was presented to and approved by him containing no enacting clause.

"It follows that Laws 1897, c. 250, is void, * * *." (Italics supplied.)

If the bill never became a law unless the bill presented to the Governor was the same as that passed by the legislature, it is difficult to see how the rule of severability could apply so as to make part of it a law.

Much the same is true of many of the decisions from foreign jurisdictions which we cited. We need not discuss all of them here.

Probably the strongest case in support of nonseverability is that of Moog v. Randolph, 77 Ala. 597.[26] The facts there with respect to the passage of the bill involved are almost identical with those in the instant case. The court said (77 Ala. 599) :

"* * * inasmuch as a *bill,* under the mandatory provisions of this instrument, can become a *law,* only when it has gone through all the forms made necessary to give it validity and force as such, the courts will pronounce it *a law,* or *not a law,* according as the legislative records may disclose a compliance, or failure of compliance, with these constitutional requirements.

"* * * if the bill which is *passed* by the General Assembly *varies materially, in substance and legal effect,* from that which is *approved* by the Governor—especially where this subject of variance involves a matter of amendment, without the incorporation of which in the bill one of the houses refused to concur with the other in its final passage—then there exists such a want of legal and actual identity between the bill passed and the one approved, as that *neither* of them acquires the force of a valid and constitutional enactment. In such a case, the bill passed by the General Assembly is not the one approved

[26]See, also, Jones v. Hutchinson, 43 Ala. 721; Moody v. State, 48 Ala. 115, 17 Am. R. 28; King Lbr. Co. v. Crow, 155 Ala. 504, 46 So. 646; Mayor and Aldermen of West End v. Simmons, 165 Ala. 359, 51 So. 638.

by the Governor, and the one approved by the Governor is, *e converso,* not the one passed by the General Assembly. * * *

"* * * The House Journal shows, that the enrolling-clerk omitted to incorporate in the enrolled bill, no doubt inadvertently, a material *amendment,* which was a component part of the complete bill as it passed these two legislative bodies. That this omission *vitiates the entire bill,* I think, there can be no room for doubt; * * *.

"* * * *a bill is an entirety,* and a law is the product of the combined, harmonious and unanimous action of the legislative and executive departments of government, each acting strictly within the scope of its constitutional authority, and according to the prescribed forms of the constitutional mandate. When, therefore, as we have said, the measure assented to by one of these departments is not, in substance and legal effect, the measure assented to by the other, but differs from it materially in its operation as a law, it is in no proper sense a constitutional or valid enactment." (Part italics supplied.)

In Rode v. Phelps, 80 Mich. 598, 608, 45 N. W. 493, 496, the court, after discussing a variance in the bill as passed and as signed by the governor, said:

"* * * These radical differences between the act found upon the statute-book, and the bill as it passed, *preclude any idea of attempting to save any portion of the act.* It was never passed by the Legislature, and is null and void, * * *." (Italics supplied.)

With respect to the effect of the rule, the court said (80 Mich. 610, 45 N. W. 497):

"It is to be deeply regretted that as important a law as this, covering a subject of great public interest, should, because of the gross carelessness, or worse, of some one, be wiped bodily from the statute-book. But the courts are not responsible for this; nor can they usurp the functions of legislation, and, by shutting their eyes to the records of legislative doings, declare a law valid that never passed the Legislature, however well authenticated it may be by the certificates of officials."

In State v. Wendler, 94 Wis. 369, 379, 68 N. W. 759, 762, the Wisconsin court said:

"* * * The requirement which is absolutely essential is that the governor shall approve *the same law which the legislature has passed.* This is the fact *which makes a law,* and want of it makes mere waste paper."

Again, in State ex rel. Pollard v. Board of Medical Examiners, 172 Wis. 317, 321, 177 N. W. 910, 912, the Wisconsin court said:

"* * * the bill approved by the governor was not the one passed by the legislature, and is a void enactment, * * *."

Probably even more persuasive, however, than the cases which we cited in support of the rule are those supporting the rule which we rejected. In seeking to sustain the decision of the trial court on the rule of severability, respondent in Bull v. King, *supra,* cited and relied upon[27] Gwynn v. Hardee, 92 Fla. 543, 110 So. 343; People ex rel. Honore v. Olsen, 222 Ill. 117, 78 N. E. 23; People ex rel. Brady v. LaSalle Street T. & S. Bank, 269 Ill. 518, 110 N. E. 38; People ex rel. Sellers v. Brady, 262 Ill. 578, 105 N. E. 1; McAuliffe v. O'Connell, 258 Ill. 186, 101 N. E. 419; State ex rel. Attorney General v. Platt, 2 S. C. 150, 16 Am. R. 647; Berry v. Baltimore & Drum Point R. Co. 41 Md. 446, 20 Am. R. 69.

The attorney general, in his brief amicus curiae in the Bull case, in addition to some of the above cases cited the following: State ex rel. Boyd v. Deal, 24 Fla. 293, 4 So. 899, 12 A. S. R. 204; State ex rel. Attorney General v. Hagood, 13 S. C. 46; Ford v. Plum Bayou Road Improvement Dist. 162 Ark. 475, 258 S. W. 613; State ex rel. Casper v. Moore, 37 Neb. 13, 55 N. W. 299; Rice v. Lonoke-Cabot Road Improvement Dist. 142 Ark. 454, 221 S. W. 179.

With a few additions, these are the same cases we are now urged to follow.[28] Even if it could be said that the cases cited in support of the rule of nonseverability in the Bull case do not support that

---

[27] See, Respondent's Brief, p. 28, et seq., Bull v. King, 205 Minn. 427, 286 N. W. 311.

[28] See, Appellants' Brief, p. 38.

rule, it cannot be said that we did not consider both sides of the question and the authorities supporting each view.

In essence, what we are now urged to do is to follow decisions of foreign courts which we have at least twice rejected and refuse to follow our own decisions. While we should not slavishly adhere to decisions that no longer are applicable to present-day conditions, neither should we lightly overrule decisions that have been carefully arrived at after a thorough consideration, unless it can be shown that social or economic conditions have changed so as to make the decision no longer applicable to present conditions or that the statutory or case law on which the decision rests has been altered so that it no longer is sustained by such decision or we are convinced that the case was decided improperly because of a failure to present or consider matters now before us which we did not have before us at the time the decision was rendered. Our attention has not been called to any of these situations in this case.

Determination of this case involves no long-range policy of the state. Slightly more than a year will elapse until the legislature again will convene, and, if it then sees fit to do so, it can reenact the bill and present it to the Governor in a constitutional manner. Government by law instead of by man, which is the main bulwark to our democratic form of government, demands a decent respect for the rule of stare decisis in order that citizens of this state will be assured that decisions of the court are good for more than "one trip and one day only." Our decision in Bull v. King, Freeman v. Goff, and Minnesota Mut. L. Ins. Co. v. Johnson, *supra,* were all unanimous and were decided by the same personnel then serving on the court.[29] It is only by concluding that, had the present members of the court been serving then, we would have decided differently that we could justify overruling these decisions. If the decisions of this court are to be subject to change every time the personnel of the court changes on the unwarranted assumption that our wisdom is superior to that of our predecessors, then there will be little remain-

[29]Henry M. Gallagher, Andrew Holt, Royal A. Stone, Clifford L. Hilton, Charles Loring, Julius J. Olson, and Harry H. Peterson.

ing of the old doctrine of stare decisis and the stability it has furnished the law.

The instant case and that of Minnesota Mut. L. Ins. Co. v. Johnson, *supra,* illustrate the inadvisability of fluctuating from one position to the other. In this case the attorney general argues for the rule of severability. In the Minnesota Mutual case the then attorney general argued against the rule of severability. If we are to decide cases purely on the basis of the exigencies of the particular case before us, then the decisions of this court soon will be of little value.

We have carefully considered the dissents filed in this case. The dissent of Mr. Justice Thomas Gallagher advocates that we overrule our former decisions respecting the rule of severability. He cites in support of his position for the most part the cases which we heretofore have rejected. We have fully covered that question in the above opinion, which was released on November 16, 1955.

The positions taken by Mr. Justice Murphy in his dissent also have been answered in the above opinion, but, in view of the importance of the case and the public interest manifested in it, there are some conclusions reached in this dissent which we believe should be answered.

In the first place, the dissent refuses to recognize the difference between the rule of severability as applied to unconstitutional provisions of a law constitutionally enacted and a bill which fails to meet the constitutional prerequisites for enactment into law and therefore never becomes law. We have fully covered that matter in our opinion. It is completely disposed of in Freeman v. Goff, 206 Minn. 49, 53, 287 N. W. 238, 241, where we said:

"The argument that a variation is not different from an unconstitutional provision which may be stricken from a statute and yet leave the remainder intact falls because it ignores the fact that the unconstitutional provision exists in a statute validly enacted, while a material variance prevents any part of the act from ever becoming a statute. The subdivisions of an act are but parts of the whole."

The quotations in the dissent are from cases in the former category and have no application here.

In the next place, the dissent attempts to distinguish our former decisions from the case now before us. It takes the position that our decision in Freeman v. Goff, *supra,* is distinguishable because there were fewer sections in the bill involved in that case than are involved in the bill now before us. Since it is not possible to distinguish Bull v. King, 205 Minn. 427, 286 N. W. 311, on that basis, the contention is that our decision in that case, insofar as it rejects the rule of severability, is mere "dicta" and therefore not binding on us at this time. We cannot agree with either contention.

With respect to the contention of the dissent that the bill involved in Freeman v. Goff, *supra,* has less sections than the bill now before us, all that need be said is that surely we cannot have one rule of law apply to bills having few sections and another rule apply to bills having more sections. The dissent finally places the distinction between the bill in the Freeman case and the one in the case now before us on the proposition that "Unlike the case which we have to consider the entire act [in the Freeman case] was infected by the spurious portion referred to." That statement, as applied to the Freeman case, is not supported by the decision of the trial court,[30] the briefs of counsel for the parties, or our decision in the Freeman case. On the first page of argument in the brief of appellants (county attorney of Hennepin County) in the Freeman case filed in this court[31] we find the following:

"It would seem clear that that portion of the enrolled act which did not receive legislative sanction is not the law. The question would then seem to be—the effect of the spurious portion upon the remainder of the act."

Thereafter 14 pages of appellants' brief in the Freeman case are devoted to an argument urging us to adopt the rule of severability. Most of respondent's brief in that case is devoted to a contrary argument. A brief amici curiae was filed therein, part of which discusses the same question. In our opinion in the Freeman case we follow the

---

[30]See memorandum of Judge Hall in Record, p. 29, Freeman v. Goff, *supra.*

[31]Appellants' Brief, p. 6, Freeman v. Goff, *supra.*

Bull case, refusing to apply the rule of severability. For us now to say that the question of severability really was not involved at all, which is what the above statement of the dissent really means, is, to say the least, quite presumptuous.

It is obvious, as stated above, that Bull v. King, *supra*, cannot be distinguished on that basis, so it is now claimed that what we said in the Bull case is "dicta" and not binding us.

"Dicta," or more properly "obiter dicta," generally is considered to be expressions in a court's opinion which go beyond the facts before the court and therefore are the individual views of the author of the opinion and not binding in subsequent cases. Where, however, two or more issues are before the court and are argued by counsel, and the court places its decision on both even though a decision on one issue might have been sufficient to dispose of the case, the decision is equally binding as to both issues.[32] This rule is well stated in Union Pac. R. Co. v. Mason City & Fort Dodge R. Co. 199 U. S. 160, 166, 26 S. Ct. 19, 20, 50 L. ed. 134, 137, as follows:

"* * * where there are two grounds, upon either of which the judgment of the trial court can be rested, and the appellate court sustains both, the ruling on neither is *obiter*, but each is the judgment of the court and of equal validity with the other. Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no just sense, be called mere dictum."

That case quoted the following from Florida Cent. R. Co. v. Schutte, 103 U. S. (13 Otto) 118, 143, 26 L. ed. 327, 336:

"* * * It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was

---

[32]See, 11 Minn. L. Rev. 373.

as much a part of the judgment of the court as was that on any other of the several matters on which the case as a whole depended."

The reason for the rule of obiter dicta is obvious. The questions actually before the court and argued by counsel are thoroughly investigated, deliberately considered with care, and, when so investigated and considered, a decision on those issues is entitled to respect in future cases. Obiter dictum, on the other hand, is a statement of the judge on an issue not so deliberately investigated and, for that reason, is not entitled to the same respect.

In the Bull case, not only did the trial court place its decision, at least in part, on nonacceptance of the rule of severability,[33] but the major portion of the briefs of both appellant and respondent in that case is devoted to an argument of that question. In addition, the attorney general filed a brief amicus curiae urging us to adopt the rule in which a substantial portion of his brief is taken up by an argument of the same question. After that thorough consideration, we emphatically disposed of the issue in the Bull case by refusing to adopt the rule. To say that such decision is dicta ignores the definition of the term. Nor did we consider it dicta in the later case of Freeman v. Goff when we said (206 Minn. 53, 287 N. W. 241):

"* * * the variance being a material one, the *rule* announced in Bull v. King, *supra,* and the cases cited to sustain that view is that [205 Minn. 431, 286 N. W. 313], 'a material variance between the bill passed by the legislature and that approved by the governor invalidates the entire enactment,' " (italics supplied)

or in Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625, where the attorney general appeared on the opposite side of this question. In that case we said (212 Minn. 574, 4 N. W. [2d] 626):

"It is clear that amendments numbered 2, 8, and 10 are material, and if any one of the three was not in the bill when it passed, but now appears in the enrolled bill approved by the governor, there is a

---

[33] See memorandum of court in Record, p. 34, Bull v. King, 205 Minn. 427, 286 N. W. 311.

fatal variance. The lines stricken by the eighth amendment remain in the bill approved by the governor. Their presence cannot be overlooked under such cases as Sharp v. Merrill, 41 Minn. 492, 43 N. W. 385, or *Bull v. King,* 205 Minn. 427, 286 N. W. 311." (Italics supplied.)

In the latter case, the attorney general, in relying upon Bull v. King, *supra,* as authority for the rule of nonseverability, did not consider the Bull case as dicta. To now hold that this decision is dicta lacks support on any theory.

The dissent would then have us accept the decisions of foreign jurisdictions which we heretofore have rejected. Practically all of them have been considered in our former decisions. We have covered that matter in our opinion above.

Next, without advocating the repudiation of the journal entry rule, which we have followed since the beginning of statehood[34] and have followed consistently since, the dissent argues that it is not a good rule. We fail to see what the argument amounts to unless the dissent wishes to advocate that it be overruled. It is either the law of this state or it is not. If it is the law, it should be adhered to until it is rejected and some new law accepted in its place. Apparently the dissent wishes to do neither.

Finally, the dissent argues that the rule of stare decisis is not appropriate. It says:

"* * * since the subject of the act under consideration here is administrative and procedural in nature and since no business or property rights are involved, stare decisis is not appropriate."

Surely that is new doctrine in the field of law. It is true that stare decisis does not apply with the same strictness in some fields of law as in others. In the field of real estate or property law, for instance, it is applied with the greatest force for the reason that in those fields property rights may have become vested in reliance upon our decision. However, it is not inapplicable in any field. Before decisions of this court should be overruled or ignored in subsequent cases,

---

[34]Board of Supervisors v. Heenan, 2 Minn. 281 (330).

there should be some good reason for doing so. That is particularly true of decisions construing our constitution. Where such decisions have stood unchallenged for many years they should not be lightly overruled. In Trustees of Hamline University v. Peacock, 217 Minn. 399, 411, 14 N. W. (2d) 773, 779, we said:

"We should not be 'unmindful of the desirability of continuity of decision in constitutional questions.' Only 'when convinced of former error' should we overrule a line of decision law of many years' standing. Smith v. Allwright, 321 U. S. 649, 665, 64 S. Ct. 757, 765. In the words of Mr. Justice Roberts in his dissent (321 U. S. 666, 64 S. Ct. 766), we should be careful not to permit 'intolerance for what those who have composed this court in the past have conscientiously and deliberately concluded,' nor should we indulge in 'an assumption that knowledge and wisdom reside in us which was denied to our predecessors.' "

Here, there is no good reason for overruling former decisions except the desirability of the dissent to uphold this particular bill. If we are to adopt that position it would mean that this decision and all others in this field are good for one case only. Such has not been the law in the past, and we hope that it will not become the law in the future.

Furthermore, it is impossible to reconcile the inconsistency of the positions taken in the dissent. First an attempt is made to distinguish our former cases and then it is claimed that stare decisis is inappropriate. If stare decisis is inapplicable, why is it necessary to distinguish former decisions? If they have no application in this field of law, it should make no difference what we have said in former cases of a similar nature.

Affirmed.

MURPHY, JUSTICE (dissenting).

I agree that there exists a variance which might be considered material in L. 1955, c. 857, art. 9, § 1, as signed by the Governor from that passed by the legislature and would not quarrel with a decision holding that part of the act unconstitutional. I cannot agree that the

remaining parts, which are independent and self-sustaining, are invalid so as to render the entire act unconstitutional.

The so-called Reorganization Act of 1955 is a comprehensive pattern of legal enactments designed for the purpose of achieving economy and efficiency in the administration of the important departments of state government. We are not concerned with the wisdom of the provisions. The fact that these provisions were passed by both houses of the legislature and signed by the Governor is sufficient warrant of their importance. L. 1955, c. 857, is divided into ten separate and distinct enactments, each independent of the other and related only by the fact that each deals with an activity in the organization and administration of our state government.

Article I deals with the Department of Highways. It covers the subject of organization of the department, appointment and qualifications of personnel, and, among other things, transfers to it certain functions of the office of the Secretary of State and of the Minnesota Historic Sites and Markers Commission.

Article II deals with the Department of Conservation and in addition to provisions relating to its organization transfers to it duties of the State Geographic Board and the Division of Hotel and Resort Inspection.

Article III deals with the Bureau of Criminal Apprehension, contains provisions with reference to statewide law enforcement and places the bureau under the jurisdiction of the office of the Attorney General.

Article IV contains important provisions relating to the Department of Taxation and transfers to it certain tax collection functions heretofore carried on by other departments.

Article V deals with the Department of Commerce and in addition to various provisions relating to its organization transfers to that department functions heretofore carried out by the Department of Business Development, the Tri-State Waters Commission, Great Lakes-St. Lawrence Tidewater Commission, Upper Mississippi and St. Croix River Improvement Commission, Iron Range Resources and Rehabilitation Commission, and Compensation Insurance Board.

Article VI deals with the Department of Agriculture.

Article VII has to do with the Department of Welfare; places the State Parole Commission in that department; grants to the commission the power to make rules governing the granting of paroles and final discharges of offenders; and contains various provisions with relation to imposition of paroles and probation by the courts of record of the state.

Article VIII deals with the Commissioner of Administration, refers to his powers and duties including that of coordinating the functions of the various agencies of the state, and, among other things, provides that he shall be Secretary of the Executive Council.

Article IX contains ten sections which relate to certain powers of the State Auditor and Commissioner of Administration, Legislative Post-audit, State Investment Council, duties of the Treasurer with reference to report of money in the state treasury, etc. This particular article also includes provisions with relation to the keeping of records for the Board of Pardons; abolishes the Publication Board and transfers its duties to the Executive Council. It is § 1 of article IX which contains the variance that gives rise to this litigation, to which further reference will hereafter be made.

Article X deals with a variety of subjects relating to the organization and administration of various state functions.

The foregoing résumé is not intended to encompass the full scope and import of the various enactments. It is intended only to point up the fact that the so-called reorganization act deals with a variety of administrative problems in separate and distinct articles each dealing with a well-defined subject and each capable of standing by itself as an independent legislative act.

In his memorandum the trial court noted with reference to the variance which is the subject of this controversy:

"The fatal variance here involved consists of some dozen words in a document which includes more than seven thousand, and embraces a great many different subjects."

The variance occurs in § 1 of article IX. The law as signed by the Governor provides: *"The commissioner of administration after con-*

*sultation with the auditor"* (italics supplied) is empowered to formulate and prescribe a system of uniform records, accounts, etc. As actually passed by the legislature the law provided: *"The state auditor, with the advice and assistance of the commissioner of administration"* (italics supplied) is empowered to formulate and prescribe a system of uniform records, accounts, etc. This variance occurred as a result of a mistake made during the closing days of the legislative session in enrollment of the act. I cannot agree that this mistake should invalidate the entire enactment.

The essential merits of the issue here can best be understood by an examination of the circumstances and conditions which gave rise to the variance. L. 1955, c. 857, was passed during the closing days of the session. Pursuant to established legislative procedure, the bill was referred to the clerical staff of the legislature for preparation in the form of an enrolled bill for the signatures of the presiding officers of both the houses and thereafter for the signature of the Governor. This detail work which follows final approval by the legislature involves the engrossment of amendments and deletion of changes agreed upon before final passage. To perform this duty the clerical staff is furnished with various documents, including a copy of the proposed bill, committee reports, and various notes and memoranda which represent the provisions agreed upon by the legislature. From this material alone, or if informed members of the legislature are available, from information secured from them, the bill in its final form is prepared.

It is recognized that the vast bulk of final legislative work is done during the last ten days of the session, as a result of which the clerical staff is burdened with a great amount of important work which must be completed within a definite time limit. The constitution provides the work of the legislature must be limited to ninety legislative days and the Governor must sign the bills within three days from adjournment. Minn. Const. art. 4, §§ 1 and 11. It is not unusual for the legislature to require additional time to complete their work, and when this happens the constitutional sanction is complied with by the fiction of covering the clocks. But the calendar operates to

limit the Governor to three days from the constitutional date of adjournment, in which to sign the bill. In practice it happens not infrequently that the enacting, engrossing, and enrolling processes are going on during the time the presiding officers of the houses and the Governor should theoretically be engaged in the study and verification of legislative measures. The clerical staff is required to work against time and in the haste and confusion of the moment it is understandable that mistakes occur. It is not understandable that the mistake of a clerk with reference to an independent part of a comprehensive measure should thwart the will of the legislature as to the whole. The purpose of this observation is to emphasize the practical disadvantages of having provisions relating to legislative procedure embedded in the constitution and to point out that, until the constitution is revised, we should not follow a policy of narrow construction which will bring about absurd results.

In construing the constitutionality of a legislative enactment the court must be guided by the cardinal rule of construction which requires that effect be given to the intent of the legislature. The rule which should be followed is stated by Mr. Justice Magney in State v. Minnesota Federal Sav. & Loan Assn. 218 Minn. 229, 244, 15 N. W. (2d) 568, 576, as follows:

"Our duty to construe a statute so as to render it constitutional, if possible, may not be limited to construction, but extends also to elimination of part of a statute. Cases cited support that position. By eliminating the provision of the statute which limited certain deductions to state associations only, discrimination can be avoided and the statute upheld. The same credit would thus be extended to defendant and to state associations. It accomplishes equality and eliminates the discrimination now complained of. * * *

"L. 1933, c. 405, § 58, provides that each and every part of the act shall be severable. Minn. St. 1941, § 645.20 (Mason St. 1941 Supp. § 10933-21), states:

" 'Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the re-

maining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and insepara-bly connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; * * *.'

"It seems clear that the legislative intent would be to sustain the statute in a limited application rather than to eliminate entirely a tax otherwise valid. The legislative purpose was to impose an income tax on both federal and state associations. Equality may be allowed and discrimination eliminated by far less drastic action than wiping out the entire tax imposed upon federal associations. * * * We see no reason why the objectionable feature could not properly be eliminated and the statute upheld."

The foregoing paragraph is well recognized as the rule of con-struction adopted by our court. In discussing M. S. A. 645.20 in State ex rel. Grozbach v. Common School Dist. No. 65, 237 Minn. 150, 154, 54 N. W. (2d) 130, 133, Mr. Chief Justice Loring said:

"In State ex rel. Finnegan v. Burt, 225 Minn. 86, 90, 29 N. W. (2d) 655, 657, where we held that the invalidity of part of a statute does not require that all of the statute be held invalid, we said, quoting from State ex rel. Anderson v. Sullivan, 72 Minn. 126, 133, 75 N. W. 8, 9:

" '* * * The familiar rule on the subject is that, although a part of the statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the legislature would have passed the one without the other. Cooley, Const. Lim. 210.'

"Our conclusion here is supported by M. S. A. 645.20."

In State ex rel. Finnegan v. Burt, 225 Minn. 86, 29 N. W. (2d) 655, we held that, although L. 1945, c. 607, § 8, was invalid, the subject not being expressed in the title of the act in violation of Minn. Const. art. 4, § 27, that section did not render the whole act invalid.

In Kempien v. County of Ramsey, 160 Minn. 69, 72, 199 N. W. 442, 443, Commissioner Taylor pointed out that it is the duty of the court to view the act as a whole and that a statute is not defeated because it is imperfectly drawn, stating that "It must be assumed that the legislature intended to enact a valid and effective law. * * * To bring this about obvious mistakes and omissions may be corrected or supplied, * * *."

In State ex rel. Smiley v. Holm, 184 Minn. 228, 241, 238 N. W. 494, 500, this court stated:

"The fact that the legislature voted upon the subject matter in the form of a bill is not controlling. Form does not control. We look to the substance. They voted upon the particular measure. No one misunderstood. The issue was clear. They definitely gave their assent to and expressed their determination fixing definite lines, accomplishing the redistricting as they saw fit. They prescribed the districts within the meaning of said art. I, § 4. In short, they did what the constitution said they should do. Their action was effectual."

In Saari v. Gleason, 126 Minn. 378, 384, 148 N. W. 293, 296, we held that a whole statute is declared void only when "the valid and the invalid parts are so interdependent and so connected in subject-matter and purpose that it cannot be presumed the legislature would have passed the one without the other." And in State ex rel. Anderson v. Sullivan, 72 Minn. 126, 133, 75 N. W. 8, 9, Mr. Justice Mitchell said:

"Where a portion of a statute conflicts with the constitution, the question whether the other parts are also void must depend upon a consideration of the object of the law, and in what manner and to what extent the unconstitutional portion affects the remainder. The familiar rule on the subject is that, although a part of the statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the legislature would have passed the one without the other. Cooley, Const. Lim. 210. And in determining whether

the invalid portion avoids the whole act the same rule applies as in other cases where a statute is assailed as invalid, viz. that every presumption and intendment is in favor of the constitutionality of the act, and the courts will not be justified in pronouncing it invalid unless satisfied beyond reasonable doubt of its repugnance to the constitution."

But the majority would say the foregoing authorities should not control our construction of the statute in question. It is their holding that L. 1955, c. 857, never rose above the status of a bill and consequently is not a law validly enacted to which the foregoing authorities might apply. Just how this conclusion is arrived at is recognized but not readily understood. The majority holds that the bill signed by the Governor is not the same bill as that passed by the legislature. Why the change of one section of one of ten articles in the bill should make it a different bill is not explained nor does the decision explain how this change could deprive the bill of its identity so as to make it a document which this court cannot recognize as an act of the legislature. Certainly articles I to VIII, inclusive, are the same. Article X is the same, and all of article IX with the exception of § 1 is the same. But we are told, nevertheless, it is a different bill. The majority apparently feels that reasons to support this conclusion are unnecessary. While they will agree that all but a very small part of the bill represents the will of the legislature, they hold that because of that small part the bill is not the same.

Since it may be assumed there is a material variance as to § 1, article IX, that part of the bill may be rejected. Since L. 1955, c. 863, § 15, which was passed at the same session of the legislature, covers the same subject with relation to the bookkeeping duties of the State Auditor, which provision is now in force, the variance is not important.

The construction given by the majority thus results in a manifest distortion. The bill was attacked because of the spurious nature of § 1 of article IX. Because of that part the majority strikes down the remaining good parts. Section 1 of article IX is in force today as part of L. 1955, c. 863, and we see before us the strange paradox

of the good parts of a bill destroyed while the offending portion lives on because of the enactment of c. 863. A judicial construction which will permit such an incongruous result cannot be sound.

It should be considered that sound reason and judicial policy would dictate that so much of the bill as is good should be retained. But the answer of the majority is that, because of the defect in § 1 of article IX, the law never came into being and, since the law never existed, there is nothing which may be retained. This concept is arbitrary and punitive; it derives from a judicial policy that invokes the right to discipline the legislature. It is not in harmony with the spirit of construction which grants respect for the separation of powers. It is a contrived rule, easy to state, and so final in its consequences that exceptions and qualifications seem unnecessary. This reasoning ignores the fact that the bill, insofar as it represents the will of the legislature as to independent and unrelated parts, actually became a law. Articles I to X, inclusive, with the exception of § 1 of article IX have met the full requirements of legislative rules and procedures set up by the Constitution. These numerous provisions were in the bill passed by the senate and house in conformity with the rules and with Minn. Const. art. 4, § 11. The bill received a majority vote of all members[35] elected to each branch of the legislature, and the vote thereon was entered upon the journal of each house as required by Minn. Const. art. 4, § 13. The bill was considered by the committees of the two houses, was the subject of joint conferences of joint committees, and in pursuance of Minn. Const. art. 4, § 20, met the requirements with reference to three readings in the two houses. It was signed by the presiding officer of each house as required by Minn. Const. art. 4, § 21. It was enrolled pursuant to § 21, and, except for § 1 of article IX of the act, spoke the true will of the legislature. The subject matter of the act is within the constitutional power of the legislature, and it was approved by the Governor as required by Minn. Const. art. 4, § 11. The parts of the bill relating to the various agencies referred to passed all the

[35]The vote was 112 to 4 in the house and unanimous in the senate.

constitutional tests and safeguards provided for legal enactment, and they are independent of the offending part which is severable.

The authorities cited in the majority opinion in support of their construction that the entire act is unconstitutional may readily be distinguished. Freeman v. Goff, 206 Minn. 49, 287 N. W. 238, is relied upon. In that case the court had under consideration the construction of L. 1939, c. 444, which dealt with the subject of signs advertising beer and liquor in and about the premises of a retail liquor dealer. It contained five sections, all having to do with the extent to which a liquor dealer might go in advertising his merchandise. Section 1 of the act contained a provision that he was not permitted to have exterior signs on or adjacent to his premises on public streets where they would be visible to travelers. This provision was not included in the bill passed by the legislature and, of course, the act necessarily fell because it violated Minn. Const. art. 4, § 11, which provides that "Every bill * * * shall, before it becomes a law, be presented to the governor of the State." Unlike the case which we have to consider, the entire act was infected by the spurious portion referred to.

The majority cites Bull v. King, 205 Minn. 427, 431, 286 N. W. 311, 313, where there was a variance in a provision of a 1939 law relating to income tax. The court there held that the variance was not material and sustained the constitutionality of the act but in deciding the case the court expressed certain dicta upon which the majority relies here. But notwithstanding Freeman v. Goff and Bull v. King the fact remains that this court has never struck down an entire enactment because of a mistake made in the enrollment of an independent and separable part. The language in Freeman v. Goff and Bull v. King upon which the majority relies are overstatements and demonstrate the truth of Mr. Justice Holmes' observation that "General propositions do not decide concrete cases."[36] It should likewise be observed that while the dicta in Bull v. King supports the

[36]Lochner v. New York, 198 U. S. 45, 76, 25 S. Ct. 539, 547, 49 L. ed. 937, 949 (Mr. Justice Holmes' dissent).

majority view it is important to note that in that case the court did not raise the issue of severability or make a holding thereon.

Sharp v. Merrill, 41 Minn. 492, 43 N. W. 385, relied upon by the majority, dealt with a particular variance which was not material, and as in Bull v. King, the court was not faced with the responsibility of overturning an act of the legislature.

Sjoberg v. Security Sav. & Loan Assn. 73 Minn. 203, 75 N. W. 1116, is not authority for respondent's position because there the act was stricken in its entirety for failue to contain an enacting clause. The doctrine of severance cannot apply when the constitutional defect inheres in the whole enactment.

In Minnesota Mut. L. Ins. Co. v. Johnson, 212 Minn. 571, 4 N. W. (2d) 625, the court held an enactment invalid because the bill as passed by the senate and house on April 8, 1941, had not been properly corrected by the engrossing clerks to take into account certain prior amendments to the bill. The defects involved took place before the final reading. Prior to the bill's preparation for the Governor's signature the legislature had failed to enact a bill in accordance with the Constitution. This differs widely from the situation here where there is no question that the legislature followed all constitutional steps in the enacting process.

Nor are the Michigan or Wisconsin authorities cited by the majority helpful in a determination of this case. Rode v. Phelps, 80 Mich. 598, 45 N. W. 493, may be distinguished. The law there related to the single subject of liquor taxation. Amendments approved by the senate were never adopted by the house; there was a variance in the amount of tax a wholesaler should pay; there was a variance in the amount of tax which should be paid on malt, brewed, and vinous liquors; and there was a substantial variance with reference to the penal and record-keeping provisions. These variances ran through the entire bill.

State v. Wendler, 94 Wis. 369, 68 N. W. 759, should likewise be distinguished. This case relates to two bills which became confused in the legislative process. One of them related to game and fish preservation, while the other related to elections involving the change

of county seats. With reference to the game and fish bill, involved in the court's decision, it was held (94 Wis. 374, 68 N. W. 760) "That it never in fact passed the legislature, or, if it did pass, it did not pass by a yea and nay vote; and hence that it was not constitutionally passed, because it is a law making an appropriation of public money. Const. art. VIII, sec. 8." Moreover, the unconstitutional part of the bill infected the whole. Referring to specific defect, the court said (94 Wis. 378, 68 N. W. 762) :

"* * * This affected many parts of the bill, and cannot be regarded for a moment as immaterial or trivial. Granting that any bill at all passed the legislature, it is absolutely certain that it was an entirely different bill from that which the governor signed."

State ex rel. Pollard v. Board of Medical Examiners, 172 Wis. 317, 177 N. W. 910, is distinguishable since it relates to the interpretation of a provision in the Wisconsin statute setting forth the qualifications for admission to the practice of medicine, surgery, osteopathy, etc. This statute dealt with one narrow subject and turned on the meaning of the words "or" and "and." None of these cases had to do with the interpretation of statutes dealing with various subjects having independent and self-sustaining parts.

We are told that the wisdom of the rule in Freeman v. Goff derives from the experience of the past and are guided to Mr. Justice Flandrau's decision in Board of Supervisors v. Heenan, 2 Minn. 281 at p. 288 (330 at p. 336), where he warns of "tricks and *finesse*" in legislative proceedings. But this danger has been rendered negligible if not eliminated by the adoption of the journal entry rule which guarantees the integrity of legislation at each step in the channel of constitutional enactment. Moreover, the integrity of a bill may be sufficiently protected by the application of the enlightened rule of severability. An unwarranted attitude of skepticism or vague apprehension of chicanery in the legislative process should not shape our thinking. Acts of the legislature should be viewed with confidence in the integrity of its members; respect for their enactments; and a willingness, within constitutional limitations, to give effect to the purposes their acts seek to accomplish. It is difficult to find in

reason or policy support for the harsh and arbitrary position for which the respondent contends.

The decision of the majority hinges upon an interpretation of the distinction between the words "bill" and "law." It holds that a defect in an independent part of an enactment prevents any part of the bill from becoming a law. In answer to this it should be noted that the word "bill" does not have a fixed and immutable meaning. In State ex rel. Attorney General v. Platt, 2 S. C. (Richardson) 150, 157, 16 Am. R. 647, 654, the court points out that the term "Bill" while properly applicable to the enactment as a whole should not be used in its technical sense where it would not be consistent with the clear intent of the instrument:

"* * * If we should hold that the Constitution regards the enactment as a whole, in an exclusive sense, we would be led to the inevitable conclusion that to become a law all the substantial parts of the measure must have together passed through all the requisite stages. The consequences of this would be, that alteration in a substantial part during such progress would be fatal to the whole Bill.

"* * * Whether it is to be regarded as substantial, does not depend upon its importance or unimportance to the rest of the Act, but upon its being, in itself, an expression of the legislative will, capable of being the subject of a separate Act. It would lead us to the conclusion, in the present case, that, if the law in question, although, in substance, a code of legal procedure, differed, as it passed the Houses, from the enrolled Act, in respect of any matter, though a mere word, that covered a distinct expression of the legislative will, not capable of being made out by construction, applied to the rest of the Act, the whole must be regarded as unconstitutional. That the Constitution intended no such absurdity, is manifest."

That decision points out by analogy that, where by reason of error in a deed or contract it cannot be executed, the error will be eliminated "either by construction or reformation, when that can be done without the substantial destruction of that in which it inheres." The court observed it was difficult to perceive why any designated part of a statute which in itself might be the subject of an inde-

pendent legislative enactment should not be regarded as a bill. It states (2 S. C. 158) :

"* * * It is obvious that, in construing clauses of this class, substance, rather than form, is to be considered. The object to be secured is to be sought for, not alone in the formal expressions of the Constitution, nor yet in the technical character of the means employed to secure its ends, but in the nature of the subject, intended to be acted upon through such means. In a word, the language of the Constitution, in such cases, is to be construed in the largest sense fairly attributable to it, and that will best subserve the objects it has in view.

"The clauses of our Constitution under examination belong to the class just specified, their objects being to prevent abuses in the exercise of the most important function of the government, namely, that of making laws, by securing deliberation and solemnity of authentication in such form as to fix a personal responsibility at every stage in the progress of an Act of legislation. It is altogether a mistaken view to suppose that the object of these clauses was either to confer upon the signatures of the attesting officers power to cover up fatal defects in the passage of Acts, or to conserve the outward, visible and tangible form of a law, without consideration for the vital matters that are contained within it. We would altogether fail to appreciate the spirit that animates the system of constitutional law, the flower of jurisprudence, native to our own country, should we apply the narrow rules of technical construction contended for to the clauses in question. The principles characteristic of that system have been evolved from the highest reason under the experiences of a political system securing the largest field of human action and motive for the enterprise of thought. They are like the atmosphere we breathe, animating and all-pervading, and if not definable with that sharpness of outline that affords the highest qualification to the scientific mind, yet they are capable of reducing to precision and definiteness of outline the institutions and laws which derive their substance and vigor from them."

Faced with the same problem with which we are confronted here, the South Carolina court held (2 S. C. 160) *"the residue of the Act, beyond that portion held by us not to be of force as law, is unaffected thereby, inasmuch as that is a distinct and independent matter, no way affecting the scope and efficiency of the Act, according to the intention of the law-maker."* (Italics supplied.)

The Supreme Court of the State of Wisconsin is in harmony with this reasoning. In Loomis v. Callahan, 196 Wis. 518, 220 N. W. 816, the entire University Appropriation Act was attacked on the ground that the senate journal showed that that body voted, without calling for yeas and nays, to withdraw an important fiscal amendment which governed the transfer to the State Historical Society of an unexpended appropriation of $550,000 which had been made to the University Regents in 1925 for the purpose of constructing an addition to a library. There the court said (196 Wis. 528, 220 N. W. 820) :

"* * * It would be a strict, harsh, and senseless rule that would condemn the entire act because the senate consented to the elimination of amendment No. 2S without a yea and nay vote. It would call for a blind adherence to the strict letter of the constitution which killeth rather than an accordance with the spirit which giveth life."

In Gwynn v. Hardee, 92 Fla. 543, 110 So. 343, where the Supreme Court of Florida had under consideration an act which contained spurious matter not passed by the legislature, it was held that the genuine provisions should be distinguished from and independent of the spurious so as not to affect the good part of the bill. It stated (92 Fla. 558, 110 So. 348) :

"* * * To give effect to the spurious portion would cause results not intended by the Legislature. To declare the entire act invalid because it contains the spurious matter would frustrate the legislative will, not because of an unconstitutional act or omission of the Legislature, but because by a clerical error a spurious provision was inserted in the bill after its passage. This would destroy a law because by a clerical mistake, a provision not passed by the Legisla-

ture was incorporated in the bill as authenticated by the legislative officers, which spurious provision is clearly identified and may be regarded as eliminated and full effect given to the law-making intent as expressed in the provisions that were duly enacted."

We are told these authorities have heretofore been considered by this court. If that be true the fact does not detract from the force and validity of their reasoning.

Furthermore, I believe that L. 1955, c. 857, should be given effect by virtue of M. S. A. 645.20 which plainly states that the provisions of all laws shall be severable unless otherwise provided and if any part of a law be found unconstitutional and void its remaining provisions shall nevertheless be deemed valid unless they are essentially and inseparably connected with the void provisions. This court cannot presume that the legislature would not have enacted the remaining provisions without the void one. But here again we are faced with the same conception which to the majority presents an insurmountable obstacle. The majority would assert that while this statute would apply to an act which is unconstitutional by reason of a defect in substance, it does not apply to an act which is unconstitutional because of a procedural fault. While the majority concedes that the greater portion of the act successfully ran the gamut of all tests of legislative enactment, nevertheless it holds that the good parts must suffer guilt by association with the spurious part so that the entire act must fall. There is no basis for the subtle distinction between two types of unconstitutionality. A law is either constitutional or it is unconstitutional. In State ex rel. Kohlman v. Wagener, 130 Minn. 424, 428, 153 N. W. 749, 750, this court said:

"* * * It is not too much to say that the presumption in favor of regular enactment of a law is as great as the presumption in favor of the constitutionality of the subject matter of a law, and the rule in such cases is that the law is to be upheld unless its unconstitutionality is made to appear beyond a reasonable doubt."

The majority agrees that some 20 or more states apparently follow the enrolled-bill rule under which the question of severability is never raised. Under this rule the enrolled bill is conclusive of the

law and cannot be impeached by resort to legislative journals. The courts will not go behind the enrolled bill to see whether a statute has been regularly enacted. Crawford, Statutory Construction, § 139. This is the rule followed by the United States Supreme Court in Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. ed. 294. The authorities of other jurisdictions are gathered in 4 Wigmore, Evidence (3 ed.) § 1350; Ritzman v. Campbell, 93 Ohio St. 246, 112 N. E. 591, L. R. A. 1916E, 1251. The majority disposes of this impressive authority by the surprising deduction that if jurisdictions which now follow the enrolled-bill rule should sometime in the future adopt the journal-entry rule they might not consider the question of severability. It is useless to speculate what courts might do in the event they changed their policy other than to observe that it may be expected courts will be guided by the same spirit which has shaped their judgment in the past. The important point is that in those jurisdictions the rule of Freeman v. Goff could never be applied.

In addition to the jurisdictions which follow the enrolled-bill rule numerous other courts support the contention of the appellants with reference to the doctrine of severability where there is a material variance in a provision or section of the statute provided the valid portion of the section is severable from the rest of the act. Rice v. Road Impr. Dist. 142 Ark. 454, 221 S. W. 179; Ford v. Plum Bayou Road Impr. Dist. 162 Ark. 475, 258 S. W. 613; Gwynn v. Hardee, 92 Fla. 543, 110 So. 343; People ex rel. Honore v. Olsen, 222 Ill. 117, 78 N. E. 23; People ex rel. Brady v. LaSalle Street T. & S. Bank, 269 Ill. 518, 110 N. E. 38; State ex rel. Williams v. Robb, 163 Kan. 502, 183 P. (2d) 223; Berry v. Baltimore & Drum Point R. Co. 41 Md. 446, 20 Am. R. 69; State ex rel. Casper v. Moore, 37 Neb. 13, 55 N. W. 299; Cancilla v. Gehlhar, 145 Ore. 184, 27 P. (2d) 179; In re House of Representatives, 45 R. I. 289, 120 A. 868; State ex rel. Attorney General v. Platt, 2 S. C. 150, 16 Am. R. 647; City of Nashville v. Browning, 192 Tenn. 597, 241 S. W. (2d) 583; State ex rel. Board of Commrs. v. Wright, 62 Wyo. 112, 163 P. (2d) 190; Loomis v. Callahan, 196 Wis. 518, 220 N. W. 816.

The arbitrary journal-entry rule upon which the majority relies is designed primarily to enforce strict compliance with constitutional procedure and came into usage in the middle part of the last century in order to cope with corrupt legislatures. 15 Neb. L. B. 238. State ex rel. Kohlman v. Wagener, 130 Minn. 424, 428, 153 N. W. 749, 750, recognized the rule as reflected in early Minnesota cases but noted that "The authority of these decisions may have been shaken by Miesen v. Canfield, 64 Minn. 513, 67 N. W. 632, but we are not disposed at this time to overrule them." An examination of the Miesen case indicates that Mr. Justice Mitchell had reservations with respect to it and the door was left open for a departure from it until it was revived by the dictum in Bull v. King. While the so-called Reorganization Act can be given effect by invoking the doctrine of severability and it is therefore not necessary to consider an overruling of the journal-entry rule here, there are many practical reasons which compel attention should the court consider abandoning it.[37] See, 4 Wigmore, Evidence (3 ed.) § 1350; also numerous

---

[37]The journal-entry rule has been said to be unsound because it impairs the stability of the law. The Supreme Court of Iowa after vacillating between the strict enrolled-bill rule and the journal-entry rule for many years decided in Carlton v. Grimes, 237 Iowa 912, 946, 23 N. W. (2d) 883, 901, to return to the enrolled-bill rule. The court stated:

"* * * The people and the public generally, the various departments of government, all the public officers of the state, and the courts look upon the statutes set out in these Codes as the laws of the state. Not the laws maybe, or perhaps, but *the* laws. There is something fantastic and absurd in a court saying and holding: 'No. These Codes of Iowa are not *really* the laws. They are only the laws presumptively, prima facie, and on condition.' It is perhaps a harsh rule that ignorance of the law excuses no one. But it is a necessary rule. The rule is not so harsh that one is presumed to know the statute law because he may have a Code of Iowa, or if not, one is readily available, and he may read and know what the statutes provide, or he may consult a lawyer who will turn to the Code and advise him of its provisions. But if what is read is not in fact law he has no chart readily available to inform him as to his legal rights."

The Supreme Court of Wisconsin has also retreated from the strict interpretations of the journal-entry rule. Since the Wendler case in 1896, the Supreme Court of Wisconsin had not upset a single enrolled bill on the

authorities discussed in 32 Iowa L. Rev. 147 to 151; 16 Iowa L. Rev. 99; 21 Iowa L. Rev. 538 to 551; 21 Iowa L. Rev. 573 to 584; 1941 Wis. L. Rev. 439.

This brings us to an awareness of the disturbing position in which this court finds itself. The Supreme Court of Minnesota by reason of the journal-entry rule, as interpreted by the majority, is deciding a most important case in an area of law limited by minority authority. The holding of the majority here can only have the effect of further complicating the legislative process, for rather than risk the ever present danger of having an entire measure nullified by an error in a part, the legislature will be forced into the involved and time-consuming practice of considering and acting upon each provision as a separate bill.

We are told that out of respect for stare decisis the decision in Freeman v. Goff should not be disturbed. It should again be noted that Freeman v. Goff is not controlling authority for the precise holding which the majority is making here. Moreover, since the subject of the act under consideration here is administrative and procedural in nature and since no business or property rights are involved, stare decisis is not appropriate. Johnson v. Chicago, B. & Q. R. Co. 243 Minn. 58, 68, 66 N. W. (2d) 763, 770.

grounds of procedural defects in its passage. See, also, Weed v. Bergh, 141 Wis. 569, 124 N. W. 664, 25 L.R.A.(N.S.) 1217; Loomis v. Callahan, 196 Wis. 518, 220 N. W. 816. The following summarization of the present law in Wisconsin might as well apply to Minnesota. 1941 Wis. L. Rev. 457:

"The confusing, ambiguous nature of the Wisconsin cases together with the repeated refusals of the court to find that the legislative procedure was unconstitutional pretty obviously demonstrates the weakness of the journal rule. The rule is easy to state and logically there seems to be no necessity for qualifying it with numerous exceptions. * * * [It is] a doctrine which was developed without much thought from the sheer force of the habit of judicial review [and] they [judges] refuse to apply it except in extreme cases.

"Only the doctrine of *stare decisis* stands in the way of complete abandonment of the journal rule. 'This is not a rule of property. No vested rights in the rule have been created. No difficulty would be experienced by the profession were it to be changed.'"

We are warned that it is presumptuous for us to consider a change in the holding of the court which decided Freeman v. Goff and Bull v. King. We do credit neither to the distinguished members of the court which decided those cases nor to ourselves by a fatuous reverence for the dicta set forth in these opinions. They would be the first to deny the claim that their observations should be enshrined with the eternal verities. Confronted with the responsibility of making a decision in this case no one can say what their judgment would be. We do know, however, that as able jurists they would be the first to acknowledge our right and encourage our interest in a reexamination of their decisions in the light of concrete facts and present-day actualities.

We are warned of the danger of overturning established law and of the possibility of the chaos which such action might produce. This again is based on the doubtful premise that Freeman v. Goff and Bull v. King apply to the specific questions with which we are confronted. It is my opinion that because Freeman v. Goff extends the power or license to exercise a judicial veto and thereby thwarts the will of the legislature, in itself it represents a serious danger to the stability of government.

The respondent contends that a determination of this case involves no long-range policy and indicates that, if its provisions are of sufficient importance, they can be reconsidered when the legislature again meets. This attitude represents an unwarranted indifference to the importance of legislative action. The fact that the legislature of the state has seen fit to pass a comprehensive Reorganization Act after many weeks of deliberation involving the expenditure of a great deal of time and public money should impress us with the immediate importance of the matter. We should not maintain an attitude of detached indifference where the law permits an interpretation which will give expression to legislative mandates.

Nor does it add to the force of the majority decision to quote at length from briefs submitted in former cases and to point out that attorneys general in years gone by have expressed views inconsistent with those contended for in this action. The attorney general

like any other attorney is an advocate. We are interested only in determining if his position is correct now and in this particular case. A consideration of the issues should be limited to the ample decisional authorities which are the true guide to the law.

For the foregoing reasons I respectfully dissent.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that our decisions in Bull v. King, *supra,* and Freeman v. Goff, *supra,* should be overruled as against the trend of modern authority and that we should adopt what has been designated as the "rule of severability." Thereunder, an enactment of the legislature, some minor section of which contains a material variation from that signed by the Governor, would not be held invalid as to those sections to which the variance had no relation, and which therefore could be fully executed on the basis of the specific language thereof. Under this rule, if applied in the instant case, L. 1955, c. 857, with its numerous provisions designed to streamline and modernize many of our state departments, would for the most part become operative, and the vast amount of time, study, and effort expended by our legislature as well as by the experts consulted in drafting the bill would not be lost. Certainly, those sections of the bill which are unrelated to the sections in which the variance has been discovered cannot be said to have failed to meet the constitutional prerequisites for the enactment of legislation. See, Rice v. Road Impr. Dist. 142 Ark. 454, 221 S. W. 179; Ford v. Plum Bayou Road Impr. Dist. 162 Ark. 475, 258 S. W. 613; Gwynn v. Hardee, 92 Fla. 543, 110 So. 343; People ex rel. Honore v. Olsen, 222 Ill. 117, 78 N. E. 23; People ex rel. Brady v. LaSalle Street T. & S. Bank, 269 Ill. 518, 110 N. E. 38; State ex rel. Williams v. Robb, 163 Kan. 502, 183 P. (2d) 223; Berry v. Baltimore & Drum Point R. Co. 41 Md. 446, 20 Am. R. 69; State ex rel. Casper v. Moore, 37 Neb. 13, 55 N. W. 299; Cancilla v. Gehlhar, 145 Ore. 184, 27 P. (2d) 179; In re House of Representatives, 45 R. I. 289, 120 A. 868; State ex rel. Attorney General v. Platt, 2 S. C. 150, 16 Am. R. 647; City of Nashville v. Browning, 192 Tenn. 597, 241 S. W. (2d) 583; State ex rel. Board of Commrs. v. Wright, 62 Wyo. 112, 163 P. (2d) 190.

FRANK T. GALLAGHER, JUSTICE (specially concurring).

I have carefully considered the majority and minority opinions and it is undisputed that there is a material variance between the bill passed by the legislature and the one approved by the governor. This being so we are confronted with the proposition as to whether we should overrule our former decisions that a material variance between the bill passed by the legislature and the one approved by the governor invalidates the entire enactment. Bull v. King, 205 Minn. 427, 286 N. W. 311; Freeman v. Goff, 206 Minn. 49, 287 N. W. 238.

The dissenting opinion of Mr. Justice Thomas Gallagher would overrule those decisions while the dissent of Mr. Justice Murphy seeks to distinguish without overruling them. Both dissents advocate that we adopt the rule of severability which permits the unconstitutional part of a law duly enacted to be severed from the constitutional part. That rule has been applied in cases where the bill approved by the governor was the *same* bill which was passed by the legislature and subsequently a supreme court declared parts of the statute unconstitutional. I favor such a rule *where there are no material variances* as it permits the elimination of the unconstitutional parts of a statute without destroying the function of that part of the law which is constitutional.

However that is not the situation which we have before us here inasmuch as neither dissent disputes a material variance which under our previous decisions invalidates the entire act. Because of that distinction I cannot see how the rule of severability can be applied to a *bill which never became a law*. In other words *how can we separate the bad part from the good part of something that never existed?*

Even though we attempted to say that it makes no material difference whether the state auditor or the commissioner of administration formulated and prepared the system or that the variation occurred in some minor section, we cannot ignore the fact that it is apparent from a review of the house and senate journals that it did make a difference to the members of both houses which of those

officials would have the principal responsibility of preparing the system. It was only after a conference committee from the house and senate made recommendations that the state auditor was designated "with the advice and assistance of the commissioner of administration and the post-auditor" to formulate and prepare the system.

Justice Murphy's dissent cites State v. Minnesota Federal Sav. & Loan Assn. 218 Minn. 229, 15 N. W. (2d) 568, to support its contention that in construing the constitutionality of a legislative enactment the court must be guided by the rule of construction that effect be given the intent of the legislature. I heartily agree with that principle of construction, but an examination of that case discloses that the court there was considering a statute which had passed the legislature and was signed by the governor in the same form as the bill passed by the legislature. Again in State ex rel. Grozbach v. Common School Dist. No. 65, 237 Minn. 150, 54 N. W. (2d) 130, and the cases cited therein, this court was considering the severability of the unconstitutional parts of a statute passed by the legislature and approved by the governor in the same form. Other Minnesota cases cited by the minority involving the doctrine of severability refer to *statutes duly passed and not to bills approved in a materially different form* from those passed by the legislature.

I have also considered the cases from other jurisdictions cited by him, the principle of which we have heretofore rejected. I do not consider them of sufficient weight to justify our reversing the well-established decisions of our own court.

While I am not eternally attached to the doctrine of stare decisis without regard to changing conditions, I do feel that much weight must be given to our own decisions before we substitute for them the decisions of foreign jurisdictions, especially if it appears that we have previously rejected such outside authorities and if it also appears that our own decisions make sound law and have been relied upon by lawyers and other courts for years.

With another session of the legislature due to convene within a year, it seems logical that the present material differences can readily be corrected in a subsequent enactment of the law.

For the reasons herein stated I therefore respectfully concur with the majority.